543 P.2d 858

J. Reed BARRON et al., Plaintiffs-Respondents,

v.

IDAHO BANK & TRUST CO., Defendant-Appellant,

and

Placerton, Inc., Defendant-Appellant.

No. 11832.

Supreme Court of Idaho.

Dec. 18, 1975.

Wesley F. Merrill, of Merrill & Merrill, Callis A. Caldwell, Pocatello, for appellant.

Dean Williams, of Kerr & Williams, Blackfoot, for respondents.

McFADDEN, Justice.

This action was commenced by J. Reed Barron,[1] Gary Reed Barron and Nanette Rita Barron, as plaintiffs-respondents, against Placerton, Inc. (herein referred to as Placerton), a California corporation and Idaho Bank & Trust Co. (herein referred to as the bank), as defendants-appellants.[2] The Barrons sought compensatory and punitive damages and to have a certain real estate agreement declared void, and to hold the bank liable for disbursement of funds it held in escrow.

Judgment was entered in favor of the Barrons against both Placerton and the bank and each of the defendant-appellants separately appealed. We affirm.

Following preliminary negotiations, on September 11, 1972, the Barrons[3] entered into an agreement with Placerton, Inc., whereby the Barrons agreed to sell to Placerton approximately 2900 acres of Bingham County farm land with sprinkler irrigation equipment, and Placerton agreed to transfer certain real property it owned near Daly City, California, to Placerton.

The total purchase price of the Bingham County property was $1,700,000 payable by Placerton transferring the Daly City property at the agreed price of $650,000, and accepting the Bingham County property subject to a $1,050,000 mortgage due the Prudential Insurance Company.

At the time of execution of the agreement, the parties also executed an addendum to the real estate agreement wherein it was provided that Placerton was to provide "closing statement from title company that the Purchaser [Placerton] has in fact paid the sum of $285,000 for the property in Daly City, California * * *." The parties also executed at the same time an escrow agreement listing various deeds, other instruments and cash to be held by Idaho Bank & Trust Company as escrow holder. Among the documents submitted to the escrow holder were a corporation

---

1. J. Reed Barron died subsequent to commencement of this action, but prior to trial. His testimony taken at the time of an injunction hearing and by deposition is a part of the record.

2. Certain individuals were also named as defendants, but these parties were dismissed.

3. J. Reed Barron executed the agreement on his own behalf and as agent for his son and daughter pursuant to a power of attorney.

warranty deed by Placerton to the Barrons on the Daly City property; warranty deeds by Barrons to Placerton on the Bingham County property, bill of sale, and assignment of leases, title and fire insurance policies, and cash eventually totaling $101,031.40 was submitted by the Barrons to the escrow holder. This escrow agreement was brought to the bank on September 20, 1972, but the bank did not formally acknowledge receipt of the instruments until October 12, 1972.

The district court, following trial, entered extensive findings of fact; it then entered conclusions of law and decree, holding that insofar as the agreement between the Barrons and Placerton was concerned there had been no meeting of the minds between the parties and that the agreement was void for indefiniteness. The trial court quieted title to the respective parties in their real and personal property, and entered judgment in favor of the Barrons and against Placerton for $101,031.40, transferred to Placerton by the

bank. The trial court also found that the bank disbursed the money and instruments and documents held in escrow in connection with the transaction to Placerton without the escrow agreement having been fully complied with and without the written authorization of the Barrons, as required by the escrow instructions. The trial court then concluded that the bank had transferred the money and papers out of escrow without proper authority and also entered judgment in favor of the Barrons against the bank for the monies transferred out of escrow severally and collectively with Placerton. Both Placerton and the bank have separately appealed from the judgment. This opinion will deal individually with each of these appeals.

## PLACERTON APPEAL

■ The trial court in its findings of fact determined that the parties had not had a meeting of minds concerning five specific items[4] in the purported agreement of September 11, 1972, with the addendum

---

4. The agreement of Steptember 11 read in part:
   "IT IS FURTHER AGREED By and between Vendors and Purchaser as follows:
   1. That Placerton, Inc., will place in escrow time Certificates of Deposit totaling $25,000.00.
      (a) The Time Certificates of Deposit shall be released to the Purchaser at the time Ben Shrier completes his purchase of the California property or secures rezoning of the property to permit the erection of the apartment buildings contemplated.
      (b) The Time Certificates of Deposit shall be released to Mr. J. Albert Roench, Attorney at Law, in San Francisco, California, in the event Ben Shrier does not complete his purchase of the California property or secure rezoning and that the said $25,000.00 will be the cost of securing rezoning in accordance with the commitments of that certain letter of J. Albert Roench dated *Sept 15, 1971,* a copy of which shall be delivered to the vendors.
   2. Title Insurance of the California property shall be paid by Placerton, Inc., on the transfer to L. Reed Barron, et al., and that the extension of Title Insurance on the transfer from L. Reed Barron, et al., to Ben Shrier shall not exceed $50.00.
   3. If this transaction cannot be consummated Placerton shall pay all fees relative to preparation of documents and transfers.

4. If this deal is consummated as contemplated then one-half of the fees and costs of transfer shall be paid by each party.
5. The sum of $89,249.96 shall be paid by the Vendors to the Purchaser.
6. The Vendors shall assign all of their right, title and interest in and to the landlord's share of the 1972 crop production, and subject to the terms of the mortgate [sic] to The Prudential Life Insurance Company of America dated April 29, 1969, recorded as Instrument No. 146952.
7. The Vendors agree to give a good and sufficient Bill of Sale to the sprinkling and irrigation equipment which is in addition to the equipment and pumps which are principally attached to the real estate.
8. It is further agreed that the Purchaser will assume and pay those expenses which are to be paid by the landlord in connection with the leases, an account of which shall be attached hereto and by this reference made a part hereof, and referred to as Schedule 'C'.
9. Vendors shall deposit with the Escrow Agent the sum of $6,430.48, to be released upon completion of the escrow, to the Purchaser, which represents all of the 1972 wheat allotments due to the Purchaser. The reconstruction of wheat allotments has already been accomplished and has been transferred to the other property owned by the Vendors which is not subject to this sale."

thereto, and held the agreement to be void. The five challenged findings are next discussed.

(1) The trial court found that the burden of bearing the costs of zoning the Daly City property was never settled. Under paragraph 1 (n. 4, supra) Placerton agreed to place $25,000 in time certificates of deposit in escrow. This provision developed out of the fact that at the time of execution of the September 11, 1972, agreement, one Ben Shrier had executed a "Sale Deposit Receipt" concerning the Daly City property wherein he was to purchase this property from the Barrons for $650,000, payable $5,000 upon execution of the agreement, $195,000 by December 1, 1972, and $450,000 by February 1, 1973, The Daly City property had value basically as residential property which necessitated certain zoning changes.

The escrow instructions to the bank did not require that the time certificates of deposit be placed in escrow. The trial court was not convinced that there had ever been a resolution of this problem concerning the zoning of the Daly City property, and the record supports him in this regard. Inherent in the whole transaction between Placerton and the Barrons was the contemplated sale by the Barrons of the Daly City property. We find no error by the trial court concerning this finding.

(2) The trial court next found that there had not been a meeting of the minds of the parties concerning the utilization of $89,249.96 placed in escrow by the Barrons to be paid to Placerton. The Barrons contended that this sum (which with other sums later deposited amounted to $101,031.-40) was deposited to make interest payments due on the Prudential Insurance Company mortgage. Placerton contended that disposition of these funds was strictly at its option. A preliminary draft of the September 11, 1972 agreement specified that the payment was to be applied to the interest on the Prudential Insurance Company mortgage; however, as executed, the specific provision for payment to the mort-gage holder was left out. The effect of such provision was thus to require the Barrons to pay Placerton an additional sum for which there was no express consideration. Certainly, under the facts as presented by this record, it cannot be said the trial court erred in its finding that the parties had not reached an understanding concerning these funds.

(3) The trial court also found that there was no clear understanding as to the status of the leases on the Bingham County property. At the time of the transaction there were a number of tenants on this property. The Barrons had executed leases which were in effect; from these leases the Barrons were to receive substantial rental payments. The Barrons also, under the provisions of these leases, were obligated to make certain payments. The contract provided in paragraph 8 of the agreement (supra n. 4) that Placerton would assume and pay expenses in connection with the leases, with an accounting to be attached to the agreement as an exhibit. This exhibit was not attached to the agreement, nor was it submitted to the escrow holder. The preparation of this exhibit apparently was the responsibility of the Barrons. There were a number of payments made to the escrow holder on rental payment, with certain directions forwarded by the Barrons as to the expenses to be paid. The bank, however, advised Barron that this was not its responsibility in this regard. Again, we cannot say that the trial court erred in this regard, for there were a number of items still unresolved concerning the role of the Barrons and the responsibility of Placerton regarding these leases.

(4) The trial court also found that Placerton did not comply with the agreement to furnish Barrons a "closing statement." Apparently, the trial court had in mind the provisions of the addendum to the agreement by which Placerton agreed to provide "closing statement from Title Company that the Purchaser has in fact paid the sum of $285,000.00 for the property in Daly City." From the record it appears

that Placerton had in mind that one of the instruments submitted to the bank escrow holder and forwarded by the bank fulfilled that requirement, while Barron had in mind a different instrument. Placerton contends that defendant's exhibit 2 fulfilled the requirements of this contract provision. Barron, in his deposition, stated that what he was looking for was a "title company's closing report." After having been asked, "What was the nature of the paper which you saw which was titled escrow closing", Barron testified:

"It's an escrow statement. It isn't a title company's closing report. You've been told forty times they're not the same thing. That's a California situation. You've been told forty times an escrow statement is not a title company's closing statement, and that's what you wrote in ink. I had to get, and I insisted on it, and not approximately two hundred and eighty-five thousand dollars, but two hundred and eighty-five thousand dollars; and you objected to that, if you'll recall, but it was put in there because we wanted it."

The record discloses that there was substantial evidence to sustain the trial court's factual determination of this issue, and we find no error in that regard.

(5) The trial court also found that there was no meeting of the minds between the parties regarding the handling of the wheat allotments as contemplated by the real estate agreement (paragraph 9 of the agreement, supra). The record discloses that the Barrons had two wheat allotments on their property in 1972. On September 9, 1972, Barron sought to have the office of the U.S. Agricultural Stabilization and Conservation Service transfer his wheat allotment to other ground. His application was denied orally October 5, 1972, and by letter dated October 13, 1972. Thus, although the agreement recited that the wheat allotment reconstruction had already been accomplished, this was not in fact correct, and the parties were in error in

that regard, as the application was subsequently denied.

In *Phelps v. Good,* 15 Idaho 76, 96 P. 216 (1908), this court stated:

"In order to constitute a contract, there must be a distinct understanding common to both parties. The minds of the parties must meet as to all of its terms, and, if any portion of the proposed terms is unsettled and unprovided for, there is no contract." 15 Idaho at 84, 96 P. at 218.

*C. H. Leavell and Co. v. Grafe and Associates, Inc.,* 90 Idaho 502, 414 P.2d 873 (1966); *Brothers v. Arave,* 67 Idaho 171, 174 P.2d 202 (1946). The facts, as developed at trial and as found by the trial court, demonstrate that the parties failed to establish the complete agreement as contended by Placerton. Examination of the record discloses competent and substantial, although conflicting, evidence supporting these findings of fact. Thus, they must be sustained by this court. *Isaguirre v. Echevarria,* 96 Idaho 641, 534 P.2d 471 (1975). The judgment of the trial court as concerns Placerton, Inc., must be affirmed.

## IDAHO BANK AND TRUST COMPANY APPEAL

The bank assigns error to certain findings of fact by the trial court and also to the conclusions of law based thereon. It asserts that the written escrow agreement was orally modified, and that, because the contract between the Barrons and Placerton was null and void, no liability can be imposed upon it by reason of the subsidiary escrow agreement. Lastly, the bank contends that the court erred, after holding the Barron-Placerton agreement void, in attempting to place the parties in status quo because there is no way the status quo of the two principal contracting parties can be maintained if the bank is "severally and collectively obligated to repay the Barrons $101,031.40." The bank asserts the Barrons should look exclusively to Placerton for the funds which were in fact paid to

Placerton. This court does not agree with these contentions.

■ The bank contends that under the evidence the trial court erred in failing to find that the Barrons waived the requirement that the escrow be closed only by written authorization. It is undisputed that the escrow agreement provided

"You are hereby authorized and directed to deliver the above-described documents upon written advice of both parties as follows:

1. Corporation Grant Deed to L. Reed Barron.

2. The Warranty Deed, Bill of Sale, Assignment of Leases, Title Insurance Policy, Fire Insurance Policy to Placerton, Inc.

3. All of the cash or checks to Placerton, Inc. herein.

\* \* \* \* \* \*

In the event that the parties are not able to consummate their transaction as set forth in that certain Real Estate Agreement dated the *11th* day of September, 1972, then and in that event, the Corporation Grant Deed shall be returned to Placerton, Inc. and all of the other money and documents shall be returned to J. Reed Barron."

Mr. Fitzpatrick, the manager of the bank, the escrow holder, testified that the escrow papers were brought to the bank on September 20, 1972, but the bank did not sign the escrow receipt and accept the escrow until October 12. He stated that on October 12, a representative of Placerton brought in a copy of a letter from an insurance company to Shrier and a copy of a "closing statement" from a title company in California.

Fitzpatrick prepared a memorandum of special instructions concerning the escrow. As a part of these instructions appears the statement, "Do not deliver any papers or any money to anyone except upon written instructions signed by both the Seller &

The Buyer." The last entry on the memorandum was dated October 13, 1972, and reads:

"Beeler and Fitzpatrick talked to Barron on the phone this morning. Barron wants a copy of the letter from Hancock to Shrier, the closing statement and the escrow agreement. These were sent by air mail on October 13, 1972, to Sacramento. He promises that as soon as he gets these he will send a wire to the bank authorizing us to complete the escrow and release the various documents according to the escrow instructions. Beeler will sign a release agreement. The money will stay here. Beeler will want us to write a letter to Prudential Insurance Co. telling them we have the $50,000 available for him to keep his agreement and bring the mortgages current with Prudential. Barron is to send us his check for $50 for his half of the escrow fee. Beeler wants us to open a new bank account for these funds and for the funds we will receive from the tenant farmers under the assignment of the lease. We will notify the farmers to settle with us."

Concerning the telephone conversation mentioned in the memorandum of October 13, Fitzpatrick testified:

"I called him [Barron]. Both Mr. Beeler and I were present and I called him on the telephone to ask him if it were possible to close the escrow, that everything had been done that we could do. He asked for the closing statement and the letter from John Hancock to Mr. Shrier. I told him that we had mailed that to him and that he should have had it by that time· or that he would get it. He said that he had not received it yet, but that he expected he would have it the next day in the mail. We wanted to close the escrow on Monday and I would have to refer to a calendar. The Sixteenth and I was trying to get away on this vacation.[5] The conversation on the

---

5. Fitzpatrick also testified that he was absent from the bank from October 18 until November 1, 1972.

phone was that when he got these documents, he wouldn't have time to send back the written authorization to close the escrow, but that when he received them he would send us a telegram authorizing us to close the escrow. That telegram never did come."

Another officer of the bank, on October 19, 1972, closed the escrow and delivered the money and instruments to Placerton, in the absence of the Barrons, and without any written authorization from the Barrons. However, before closing the escrow, the bank secured a written opinion from an attorney, in which opinion it is stated:

"It is our opinion that the documents may be released upon request of either party providing an Indemnity Agreement is provided to the bank to indemnify the bank for any possible loss in connection with this escrow."

In conformity with that opinion, the bank did obtain a written indemnity agreement from Placerton, wherein Placerton agreed to indemnify the bank from all costs, damages, attorney fees and expenses of any nature the bank may incur in consequence of delivering the items it held in escrow.

Even if we accept the bank's argument that a written agreement may be modified by subsequent oral modifications, in this instance, at most, the only possible modification of the written escrow instructions was to the effect that the bank could release the instruments upon receipt not of written advice by Barron, but by telegraphic advice. It is undisputed that this was never received. We find no error by the trial court in this regard.

█ As concerns the next contention, that the bank cannot be held responsible under the escrow instructions when the primary agreement was found to be null and void, we find no merit in this contention.

There are two agreements involved in this action, the first between the Barrons and Placerton concerning the exchange of properties, and the second is the escrow agreement where the bank, acted as escrow

holder of the instruments involved in the first agreement. The bank has cited numerous cases for the proposition that a contract wholly void is void as to everybody whose rights would be affected by it if valid, and argues from that proposition that it should not be held liable. However, it is the conclusion of the court that this line of authority is inapposite, for the reason that the bank's liability is not dependent upon the validity of the agreement between the Barrons and Placerton, but is based on the escrow instructions or agreement.

In *Foreman v. Todd,* 83 Idaho 482, 486, 364 P.2d 365, 366 (1961), this court in discussing the role of an escrow holder quoted from 19 Am.Jur., Escrow, sec. 13, p. 430, as follows:

" 'In a broad sense, every depositary of an escrow is the agent of both parties. For the purpose of making delivery upon the performance of the conditions, he is no less the agent of the grantee than the agent of the grantor. He is empowered to aid neither, being merely the conduit used in the transaction for convenience and safety. He may, therefore, be looked upon as a special agent of both parties, with powers limited only to those stipulated in the escrow agreement. Strictly, however, the depositary is not an agent at all, but rather the trustee of an express trust with duties to perform for each of the parties, which duties neither can forbid without the consent of the other. When the depositary knows the terms of the agreement so that he may understand his duties, he acts by virtue of his own powers, and not as the agent of anybody * * *' "

The court then went on to say:

"Duties of an escrow holder are those set out in the escrow agreement. The holder acts as a depositary, and is not concerned with nor responsible for defects in the title to the property." 83 Idaho at 486, 364 P.2d at 367.

**312**

By its actions the bank, contrary to the terms of the escrow instructions, paid the money to Placerton and it must be held responsible for that action.

 Concerning the bank's last contention to the effect that there is no way the status quo of the two contracting parties can be maintained if the bank is held severally and collectively obligated to repay the Barrons the sum of $101,031.40; again we find no merit to this contention. The Barrons are entitled to payment of that sum only, not to payment of that amount by both the bank and Placerton. Insofar as the Barrons are concerned, it is immaterial which of the appellants makes that payment, as long as it is made.

The judgment of the trial court is affirmed as to both appellants. Costs to respondents.

McQUADE, C. J., and DONALDSON, SHEPARD and BAKES, JJ., concur.