414 P.2d 873

**C. H. LEAVELL AND COMPANY, a corporation, and Morrison-Knudsen Company, Inc., a corporation, Plaintiffs-Appellants,**

v.

**GRAFE AND ASSOCIATES, INC.,**
**Defendant-Respondent.**

No. 9602.

Supreme Court of Idaho.

May 12, 1966.

Rehearing Denied June 15, 1966.

504

Langroise, Clark & Sullivan, Boise, for appellants.

Elam, Burke, Jeppesen & Evans, Boise, for respondent.

McQUADE, Justice.

In the spring of 1961 Hercules Powder Company invited general contractors to bid for the construction of an Air Force "Minuteman" missile installation at Magna,

Utah. C. H. Leavell & Company and Morrison-Knudsen Company, Inc., plaintiffs-appellants herein, entered into a joint venture agreement for the purpose of obtaining the prime contract.

If appellants were awarded the prime contract, they intended to subcontract various sections of the plans and specifications to other contractors who specialized in particular phases of the construction industry. One of the major portions of the project to be subcontracted was the mechanical section, which accounted for about one-third of the amount of the contract.

The contractors, subcontractors, materialmen and suppliers who intended to bid on the project gathered at the Hotel Utah in Salt Lake City, Utah. The contractors' bids were to be opened at 2 p. m. on July 11, 1961. For a few days before and on the bidding day, all of these interested parties conducted continuous negotiations and discussions to formalize their bids at the lowest price. Defendant-respondent herein, Grafe and Associates, Inc. (then known as Grafe-Weeks), was desirous of obtaining the subcontract for the mechanical work on the project. A team of Grafe-Weeks estimators and engineers, under the direction and supervision of Robert Bergstrom, worked for several weeks prior to the bidding day to arrive at a proposed bid on the subcontract.

On the morning of July 11, Bergstrom, on behalf of Grafe-Weeks, submitted a written bid for the mechanical section to Mr. Leavell, who was appellants' representative at the bidding. The relevant part of the bid stated:

"We submit our subcontract quotation for * * * installation of all Mechanical Piping as included under Division II Mechanical Section with the following exclusions:

1. Section 5–E Elevated Tank

2. Section 20 Cafe & Kitchen Equipment

3. Section 15 Painting of Elev. Tank

4. Exclud. Barricades, signs, flags, lights, power, water, heat—which is to be furnished by you.

Total amount of proposal $3,463,000.00."

Later that morning, pursuant to several conversations between Leavell and Bergstrom, they modified the Grafe-Weeks bid by oral agreement. At Leavell's request, Bergstrom agreed to reduce the bid by $50,000 and in turn Leavell stated that Grafe-Weeks would be "locked in;" i. e., if the joint venture was selected as the prime contractor for the project, it would award the mechanical subcontract to Grafe-Weeks. One of the major points of dispute between the parties concerns appellants' contention that Bergstrom also agreed that Grafe-Weeks would secure a performance bond and pay the premium thereon. Bergstrom's testimony is less

positive than Leavell's. He testified that the subject of a performance bond arose in his conversations with Leavell, but what he told Leavell was that "Mr. Grafe [respondent's president] put up performance bonds before, I see no reason why he can't put up performance bond on this." Bergstrom acknowledged that he knew Grafe-Weeks could not secure a performance bond because of its precarious financial condition but that Paul Grafe, personally, could and had procured performance bonds previously. As to the payment of the premium on the bond, Bergstrom testified that because a bond was not required by the plans and specifications, its cost had not been included in the Grafe-Weeks bid but that he told Leavell "the premium [about $12,000] for this size of a job was such a small amount it could be absorbed." Leavell testified in this regard:

"Q. Did you require them [Grafe-Weeks] to have a bond? Was this one of the requirements?

"A. I asked them only if they could make a bond.

"Q. You never have asked them really to have to put one up, is that correct?

"A. No.

\*       \*       \*       \*       \*       \*

"Q. So there was nothing definitely settled about the bond then?

"A. No, I was simply told that the bond could be made by the administrator or the executive [Bergstrom] I was talking to."

Leavell later changed this testimony, however, wherein he stated that he had reached a complete agreement with Bergstrom regarding the bond whereby Grafe-Weeks would furnish and pay the cost of the bond.

Leavell also testified that had he known on July 11, 1961, that Grafe-Weeks could not furnish a performance bond, "it would, indeed, have changed my thinking and attitude towards Grafe-Weeks" and on the agreement with them, indicating that the furnishing of a performance bond was considered by appellants to be a material aspect of any contract that might be reached between appellants and respondent.

At the bid opening on the afternoon of July 11, appellants' bid was low and they were subsequently awarded the prime contract. Pursuant to a request by Leavell that Grafe-Weeks confirm the $50,000 reduction in its bid, Bergstrom, on July 17, sent a telegram to each of the appellants, which stated, in relevant part:

"This will confirm our bid for the above as follows:

"We bid all mechanical work as listed. Under Division II of the specifications, with the following exceptions:

"(1) Section No. 20 Cafeteria & Kitchen equipment

"(2) Section No. 15, paragraph 15–07 (a) Interior surfaces & b.i. exterior surfaces. Cleaning & painting of elevated steel tank.

"(3) Section No. 5–E-Outside utilities—elevated steel tank.

"(4) We also exclude barricades, signs, flags, lights, power, water, heat and electrical.

"Our bid for above subject ...........
$3,413,000.00"

No mention was made in the telegram of the performance bond.

On July 18, after receiving this telegram, a representative of appellants wrote a letter to respondent, which stated:

"Your proposal for mechanical work * * * in the sum of $3,413,000.00 *including a performance and payment bond*, is hereby accepted.

&ast; &ast; &ast; &ast; &ast; &ast;

"The amount shown in paragraph I excludes the following items specified under Division II, Mechanical, of the Contract Specifications:

"1. Section 20, Cafeteria and Kitchen Equipment (*only the Cafeteria and Kitchen Equipment items specified to be furnished and installed by others are covered by this exclusion. All rough-in*

*work required therefor is considered your responsibility*.)

"2. Section 5E, Outside Utilities—Elevated Steel Water Tank, and the painting thereof as specfied in Section 15, Painting, Paragraph 15–07, Elevated Steel Water Tank.

&ast; &ast; &ast; &ast; &ast; &ast;

"Please signify your acceptance of this award by signing in the space allocated for your signature below * * *." (Emphasis supplied)

It is to be noted that this letter substantially differed in at least three respects from respondent's original written bid and the confirming telegram. First, it included the requirement that respondent obtain and bear the cost of a performance bond. Second, it modified exclusion number one (1). And third, it omitted respondent's fourth exclusion relating to the temporary construction utilities—"barricades, signs, flags, lights, power, water, heat and electrical."

Subsequent communications between the parties found them unable to agree on the scope of Grafe-Weeks' responsibilities. Thereafter Grafe-Weeks refused to enter into a formal contract to perform the mechanical section of the project. There were many other facts developed in more than one thousand pages of trial transcript, but the foregoing reflects the material facts necessary for this decision.

The appellants instituted this action, alleging two theories—breach of contract and promissory estoppel. The trial court, sitting without a jury, entered judgment in favor of respondent. From that judgment, appellants have appealed.

The central issue involved in this appeal is whether, prior to respondent's refusal to perform the mechanical work, a binding contract was entered into between the parties, i. e., whether appellants ever accepted Grafe-Weeks' bid (offer). The trial court found that "no contract was ever formed between the plaintiffs and the defendant" and that the parties "only agreed on the price of a subcontract and * * * [the lock-in arrangement] but they failed to reach an understanding on other essential terms of an agreement. Neither * * * had a meeting of the minds as to the scope of the work to be performed by Grafe-Weeks Corporation or as to whether Grafe-Weeks Corporation would be required to furnish a performance bond."

As indicated above, the evidence on the question of whether a "meeting of the minds" occurred is conflicting and in dispute. On appeal, this court will not set aside findings of fact if there is substantial evidence, though it be conflicting, to support the conclusion of the trial court. I.C. § 13–219; Conley v. Amalgamated Sugar Co., 74 Idaho 416, 263 P.2d 705 (1953).

The trial judge, in his memorandum decision, noted the conflict in the oral testimony and, for the purpose of ascertaining the true intentions of the parties, placed considerable weight on the documents which were prepared contemporaneously with the transaction or shortly thereafter.

The general rules for the formation of a binding contract have been set forth in Phelps v. Good, 15 Idaho 76, 96 P. 216 (1908):

"In order to constitute a contract, there must be a distinct understanding common to both parties. The minds of the parties must meet as to all of its terms, and, if any portion of the proposed terms is unsettled and unprovided for, there is no contract. 9 Cyc. 245. An offer to enter into a contractual relation must be so complete that upon acceptance an agreement is formed which contains all of the terms necessary to determine whether the contract has been performed or not. 1 Page on Contracts, sec. 27; 9 Cyc. 248. An acceptance of an offer, to be effectual, must be identical with the offer and unconditional, and must not modify or introduce any new terms into the offer. 1 Page on Contracts, sec. 45; 9 Cyc. 267. An acceptance which varies from the terms of the offer is a rejection of the

offer and is a counter proposition, which must in turn be accepted by the offerer in order to constitute a binding contract. 9 Cyc. 290." 15 Idaho at 84, 96 P. at 218.

Grafe-Weeks' original written offer was not accepted by appellants as is evidenced by the oral modification. As stated heretofore, the parties then agreed on the price and the lock-in feature. The parties, however, did not arrive at an understanding such as to form a complete contract in that there were essential terms upon which agreement was not reached, e. g., the performance bond and the scope of the work to be performed by respondent. See Restatement, Contracts § 32; 1 Corbin, Contracts § 29.

■ Because there is a conflict in the testimony regarding whether Grafe-Weeks was to furnish a performance bond, documents introduced are helpful in resolving the conflict. At Leavell's request, Bergstrom, by telegram of July 17, confirmed the reduction in Grafe-Weeks' bid. Leavell, however, did not request a confirmation as to the bonding requirement and Bergstrom's telegram did not mention the bond, indicating no agreement was reached on that provision. Upon receiving Bergstrom's telegram, appellants had an opportunity to unconditionally accept respondent's offer and thereby consummate a binding contract. There was no such acceptance by appellants' reply letter of July 18; rather, it pro-posed new terms in that appellants required Grafe-Weeks to furnish a performance bond, modified the exclusion concerning cafeteria equipment and omitted respondent's exclusion of the construction utilities. Appellants contend that when two parties have entered into a binding contract, subsequent attempted modifications by one party do not impair the agreement previously reached. That conclusion, however, begs the issue, i. e., was a binding contract entered into? The record fails to establish that the parties had a complete meeting of the minds regarding the furnishing of the performance bond and since it was considered by appellants to be a material term of the contract, the trial court's conclusion that a binding contract was not formed is supported by substantial evidence.

■ Appellants urge that the custom and usage of the construction industry require a performance bond to be furnished by subcontractors and that such provision may be supplied by the courts when it is omitted from an agreement. Whether that is applicable in the instant case need not be determined as the trial court found "That the joint venture has failed to prove there is a custom and usage in the industry that Grafe-Weeks Corporation should be required to supply a performance bond." Here too the testimony is conflicting and this finding of the trial court is supported by substantial evidence. The evidence

tends to show that the requirement to furnish a bond is often negotiated and very often a prime contractor will not ask a subcontractor to furnish such a bond.

In addition, the evidence indicates that the parties failed to reach an understanding concerning the scope of the work which was to be performed by respondent. Respondent consistently named certain exclusions in its offers to appellants. Appellants' letter of July 18 indicates that they did not unequivocally accept these exclusions. They insisted on Grafe-Weeks' furnishing those items of cafeteria and kitchen equipment not "furnished and installed by others." It appears that at least two items of such equipment were not to be furnished by others and, therefore, were considered respondent's responsibility.

Furthermore, this letter made no reference to respondent's exclusion of the construction utilities. Appellants attempt to minimize the importance of this omission by claiming that the plans and specifications for the mechanical portion of the project did not include any provision for these utilities and that under a different section of the plans and specifications the prime contractor is required to furnish these utilities. While this is true, there is substantial evidence that though the prime contractor installs these utilities, he charges the subcontractors for their proportional

use thereof. Grafe-Weeks expressly excluded this cost in its offer and was entitled to have it accepted without omission or modification before being contractually bound to appellants. As was stated by the trial court in its memorandum decision, no express agreement had been reached on this point, which is further support for the conclusion that appellants and respondent had not entered into a binding contract.

An acceptance of an offer, in order to create a binding contract, must unqualifiedly and unequivocally agree to all the material terms of the offer and must not include any new conditions or provisions. Brothers v. Arave, 67 Idaho 171, 174 P.2d 202 (1946); Hoskins v. Michener, 33 Idaho 681, 197 P. 724 (1921); Restatement, Contracts §§ 58, 59 and 60.

The trial court stated in its memorandum decision that the various communications between appellants and respondent, both written and oral, appear to be nothing more "than a series of offers and counter offers which never ripened into a binding contract." This finding is supported by substantial evidence.

Appellants contend that even if the court finds that the parties did not enter into a binding contract, they nevertheless are entitled to recover damages under the theory of promissory estoppel. That doctrine has

been applied with increasing frequency and is especially applicable to the construction industry—fundamentally it provides that when an offer (bid) is made and the offeror knows or has reason to know that the offeree will act in reliance upon that offer, the offeror is thereafter estopped from withdrawing his offer until the offeree has had a reasonable opportunity to accept.[1] As noted, the offer is irrevocable for a reasonable time and the application of the doctrine merely nullifies an attempted revocation by the offeror during this period. The circumstance is analogous to an option—in both instances, before a binding contract is formed, the offeree must *accept* the offer unconditionally. As stated in Drennan v. Star Paving Company, 51 Cal. 2d 409, 333 P.2d 757 (1958):

> " * * * a general contractor is not free to delay acceptance after he has been awarded the general contract in the hope of getting a better price. Nor can he reopen bargaining with the subcontractor and at the same time claim a continuing right to accept the original offer." 333 P.2d at 760.

Because appellants did not accept respondent's offer and because the parties' communications amounted to no more than continued negotiations, the doctrine of promissory estoppel is not applicable to the present case. Mere use of respondent's bid is not tantamount to an acceptance. O. C. Kinney, Inc. v. Paul Hardeman, Inc., 151 Colo. 571, 379 P.2d 628 (1963); R. J. Daum Const. Co. v. Child, 122 Utah 194, 247 P.2d 817 (1952); Milone and Tucci, Inc. v. Bona Fide Builders, 49 Wash.2d 363, 301 P.2d 759 (1956).

Upon reviewing the entire record, it must be concluded that there was sufficient evidence to support the findings of the trial court that appellants did not accept respondent's offer and, therefore, no binding contract was created. Appellants' other assignments of error relate to fact findings by the trial court which are not necessary to discuss in light of the above conclusions.

The judgment below is affirmed.

Costs to respondent.

SPEAR, J., NORRIS, D. J., and SCOGGIN, D. J., concur.

---

1. See Judge Traynor's excellent analysis in one of the landmark cases on the subject, Drennan v. Star Paving Company, 51 Cal.2d 409, 333 P.2d 757 (1958).