651 P.2d 928

Nick F. GYURKEY, Plaintiff-Appellant,

v.

Lloyd BABLER, Jr., Thomas Babler, Raymond A. Town, Jr., dba Western International Investors & Development Co., a partnership; and David Barovetto, James Ruscitto, III, individually and also dba Low Profile Architecture, a partnership; and Terry Cox, Defendants-Respondents.

No. 13466.

Supreme Court of Idaho.

Sept. 29, 1982.

Daniel A. Slavin, Twin Falls, for plaintiff-appellant.

Terry G. Hogue, Ketchum, for defendants-respondents Babler, Babler and Town, dba Western International Investors & Development Co.

Lawrence J. Young, Ketchum, for defendants-respondents Cox, Ruscitto and Barovetto.

BAKES, Chief Justice.

## I

## FACTS

Plaintiff appellant Gyurkey brought suit to enforce a right of first refusal to purchase real property in Ketchum, Idaho. Following the presentation of the plaintiff's evidence, the district court dismissed plaintiff's claims pursuant to I.R.C.P. 41(b). Gyurkey now appeals that decision.

In May, 1977, Western International Investors and Development Company, a partnership comprised of Lloyd Babler, Jr., Thomas Babler and Raymond Town [hereinafter Babler], owned eight lots in a subdivision located at the foot of Warm Springs Run, Ketchum, Idaho. These lots were known and designated as Lots 7 through 14, Block 1, Warm Springs Village Subdivision, 2d Addition Revised, Ketchum, Idaho. Lots 8 through 14 were listed for sale by Babler with the Ketchum real estate firm of Capik, Carr & Gillis during 1977. Phil Gillis of the firm acted as agent for Babler.

On May 11, 1977, plaintiff Gyurkey purchased Lot 14 of the subdivision for $27,777. Lot 14 is contiguous to the Lift Haven Inn, previously purchased by Gyurkey. The purchases of the inn and Lot 14 were effected

in behalf of Gyurkey by Thomas Curran, a real estate broker and owner of Bitteroot Realty. Curran prepared, at the direction of Gyurkey, the purchase/sale agreement for Lot 14. At Gyurkey's request, Curran included a right of first refusal on the adjoining Lot 13, stating as follows: "Seller agrees to give the buyer a first right of refusal on Lot No. 13, and buyer will have five (5) business days to meet any other offer on the same terms and conditions." The agreement was submitted to Gillis and subsequently accepted by Babler on May 24, 1977. Between May and December, 1977, Gyurkey made two offers to purchase Lot 13 from Babler, one for $27,770 and one for $33,000. Both offers were submitted by Curran through Gillis and rejected by Babler.

Following negotiations on February 2, 1978, Babler signed an earnest money agreement presented by defendant respondents Cox, Ruscitto, and Barovetto. Under the terms of the agreement, the three were to receive Lots 8 through 13 in exchange for building on Lot 7 a house for Babler having a value of $204,000, less real estate commissions and $6,000 received as earnest money. During negotiations leading up to the agreement, Babler informed Barovetto about the right of first refusal which Gyurkey held on Lot 13. Barovetto was also told that Babler would have to place a fair market value on Lot 13 in order to give Gyurkey an opportunity to exercise his right of first refusal. Consequently, the agreement between Babler, Cox, Ruscitto and Barovetto provided that Lots 8 and 13 were valued at $50,000 each, and that Lots 9 through 12 were valued at $26,000 each. The listing agreement for the properties, dated May 20, 1977, had stated a selling price of $30,000 cash net for each of Lots 9 through 13, and $32,500 cash net for Lot 8. Also, Babler admitted at trial that the January, 1978, earnest money agreement was the first time that any of lots 9 through 13 had been listed at substantially different prices. It was agreed between Babler and the purchasers that should Gyurkey exercise his right of first refusal and purchase Lot 13 for $50,000, the money received by

Babler from Gyurkey would be used in the construction of the residence for Babler.

Immediately following Babler's acceptance of the Cox offer on February 2, 1978, Gillis called Bitteroot Realty for the purpose of informing Gyurkey that he had five days in which to exercise his right of first refusal to purchase Lot 13 for $50,000. Curran was out of town, so Gillis spoke with Millington, a real estate salesman at Bitteroot Realty. Millington took the message, and placed a call to Gyurkey's residence. Gyurkey was not at home, and Millington left a message with Gyurkey's answering service indicating that there was a pending sale of Lot 13 for $50,000 and that Gyurkey had five days in which to exercise his right of first refusal. Millington also asked Judy Campbell, a secretary at Bitteroot Realty, if she would relate the information to Gyurkey, knowing that Campbell had been seeing Gyurkey. Campbell telephoned Gillis to confirm the existence of the pending sale and related that information to Gyurkey that evening. Gyurkey admitted receiving both messages.

After receiving the information on the pending sale, Gyurkey approached an adjoining property owner concerning a joint purchase of Lot 13. The adjoining property owner indicated that he was not interested, and Gyurkey then told Curran of Bitteroot Realty that he was unable to exercise his right of first refusal because of insufficient funds. Thereafter Curran called Gillis on or about February 7, 1978, and informed him that Gyurkey was not going to exercise his right of refusal. This information was in turn relayed to respondents.

During March, April and May of 1978, Curran, on behalf of Gyurkey, periodically called Gillis to inquire whether the Cox-Babler exchange had been culminated. In May of 1978, Curran requested on behalf of Gyurkey, copies of the Cox-Babler earnest money agreement. That document was delivered to Curran who transmitted it to Gyurkey. Construction on the home began in July, 1978. Also, on July 4, 1978, a release agreement was executed between Babler, Cox, Barovetto and Ruscitto, and

provided for the transfer of one lot per every $30,000 in labor and materials actually expended on the residence. The agreement stated that it was to "serve as a contract for [the] property exchange." From the record in this case, it appears that Lot 13 has not yet been transferred. Later in July Gyurkey filed suit against the respondents alleging that he had not been notified of any *bona fide* offer for the purchase of Lot 13, and that the conveyance of Lot 13 "was and is in fraud of [his] rights under his first right of refusal." As relief, Gyurkey requested "an opportunity to purchase said real property for the sum of $30,000 in accordance with the right of first refusal held by plaintiff."

Following the presentation of plaintiff's case, the court ruled against Gyurkey finding that the $50,000 purchase price had been determined by Babler in good faith, that Bitteroot Realty was plaintiff's agent with respect to the purchase of Lot 13, and that notice of the pending sale had properly been given to Bitteroot Realty, and that in any event plaintiff had actual notice of the pending sale of Lot 13. Consequently, the trial court found that Gyurkey had been given the opportunity to exercise his right of first refusal and had failed to do so.

On appeal Gyurkey argues that the notice he received concerning the pending sale was insufficient to require him to exercise or else lose his preemptive right to purchase Lot 13. Additionally, it is asserted that the agreement between the respondents essentially provided for the sale of Lot 13 at the price of $30,000, and that appellant is entitled to purchase Lot 13 at that price pursuant to his right of first refusal.

## II

### NOTICE

■ Concerning the question of notice, we think the record is clear that, notwithstanding an asserted lack of agency on the part of Bitteroot Realty employees, the appellant received actual knowledge of the contents of Babler's communication to Bitteroot Realty in regard to the sale of Lot

13. The question thus becomes whether that communication by Babler of itself was sufficient to require a decision by Gyurkey as to whether he would exercise his right of first refusal. We hold that it was not.

■ It is a basic principle of contract law that, in order to create a contract, an acceptance must be unconditional, identical to the offer, and must not modify, delete or introduce any new terms into the offer. *Turner v. Mendenhall*, 95 Idaho 426, 510 P.2d 490 (1973); *C. H. Leavell & Co. v. Grafe & Assoc., Inc.*, 90 Idaho 502, 414 P.2d 873 (1966). The same principle applies to rights of first refusal. Where such a preemptive right to purchase is based upon the preemptor's meeting the same terms and conditions of a third party's offer which the seller intends to accept, the outstanding offer becomes in essence the seller's offer to the preemptor by operation of the right of first refusal, and in order to accept that offer, the preemptor must fully meet the terms and conditions of the offer in his acceptance. *See Sports Premiums, Inc. v. Kaemmer*, 595 P.2d 696 (Colo.App.1979); *Duane Sales, Inc. v. Carmel*, 49 N.Y.2d 862, 427 N.Y.S.2d 930, 405 N.E.2d 175 (1980). It necessarily follows as a corollary to that rule that the holder of such a right of first refusal cannot be called upon to exercise or lose that right unless the *entire* offer is communicated to him in such a form as to enable him to evaluate it and make a decision. In most transactions, as is the case here, the seller receives a *written* offer to purchase setting forth the terms and conditions of the offer. The preemptor, under a right of first refusal requiring acceptance on the same terms and conditions, is entitled to no lesser means of receiving the offer than is provided to the seller by the third party offeror.

In the present case Gyurkey was never presented with the full terms of the offer submitted by respondents Cox, Barovetto and Ruscitto, and likewise never received the offer in the form that he was entitled to receive it. A written offer was presented by Cox to Babler in January, 1978, which was accepted and which became the earnest

money agreement between those parties. In order to adequately apprise the appellant of the outstanding offer, Babler should have sent Gyurkey a copy of the written offer. Instead, Gyurkey received a relayed oral communication indicating a $50,000 cash sale price for Lot 13. That notice was clearly insufficient both in form and in substance.

Subsequently, in May, 1978, Gyurkey did receive a copy of the January, 1978, earnest money agreement. However, the respondents entered into an additional agreement on July 4, 1978, which set terms concerning the securing of payment and the transfer of the lots. Since the January, 1978, offer did not contain all the terms and conditions that were contained in the final agreement between the respondents, it is clear that the appellant's right to receive notice of all the terms and conditions of the offer, which Babler intended to and in fact did accept, was not satisfied.

## III

### SEPARATE PRICING

Respondents argue that notice of the full transaction was not necessary and that appellant was adequately informed of the pertinent terms relating to Lot 13, because that lot was separately priced and therefore severable from the sale of the other lots. In prior cases, not involving the separate pricing of an included piece of property, the courts have overwhelmingly concluded that a seller may not defeat a preemptive right to purchase a particular piece of property by selling that property as part of a larger tract. *Wilson v. Brown,* 5 Cal.2d 425, 55 P.2d 485 (1936); *Mark Keshishian & Sons, Inc. v. Washington Square, Inc.,* 414 A.2d 834, 839 n. 9 (D.C.App.1980); *Myers v. Lovetinsky,* 189 N.W.2d 571, 576 (Iowa 1971); *Anderson v. Armour & Co.,* 205 Kan. 801, 473 P.2d 84, 89 (1970); *Brenner v. Duncan,* 318 Mich. 1, 27 N.W.2d 320 (1947); *Guaclides v. Kruse,* 67 N.J.Super. 348, 170 A.2d 488, 494–95 (1961); *C & B Wholesale Stationery v. S. DeBella,* 43 A.D.2d 579, 349 N.Y.S.2d 751 (1973); *New Atlantic Garden v. Atlantic Garden Realty,* 201 A.D. 404, 194 N.Y.S. 34 (1922), *aff'd* 237 N.Y. 540, 143 N.E. 734 (1923); *L. E. Wallach, Inc. v. Toll,* 381 Pa. 423, 113 A.2d 258 (1955); *Atlantic Refining Co. v. Wyoming National Bank,* 356 Pa. 226, 51 A.2d 719 (1947); *see Garmo v. Clanton,* 97 Idaho 696, 551 P.2d 1332 (1976) (reaching same conclusion as to noncontiguous parcels sold as part of the same transaction); *see also* Annot. 170 A.L.R. 1068 (1947). The question in this case goes a step further in asking whether the same is true where the relevant property has been separately priced in the transaction. In our review of the cases, we have found only one instance where the issue has been explicitly addressed, and that only in brief *dictum.* In *Myers v. Lovetinsky, supra,* the court simply stated that separate pricing "entitles the tenant to buy the [included lots] the same as if they had been sold alone by the landlord." 189 N.W.2d at 575. However, we cannot agree.

In our view, the fact that the sale of Lot 13 was included as part of the sale of a larger tract of land, even though separately priced, denies appellant by the very nature of the transaction, the right to purchase Lot 13 on the same terms and conditions which Babler intended to accept. By possessing the right to purchase on the same terms and conditions, appellant had in essence the right to obtain precisely the same "bargain" on Lot 13 as the seller was willing to grant to a third party offeror. In such a transaction as presented here, it is simply impossible for a preemptive rightholder to verify the precise price, not to mention other terms and conditions, at which he is entitled to purchase the property in order to obtain the same bargain on the lot that the third party offeror is to receive. Any separate pricing of lots within the larger tract to be sold can really be nothing more than an allocation of value in relation to the whole, rather than an independent offer on the included lot, even if done in good faith, since the true value of the lot rests in its inclusion as part of the larger sale. The preemptor, however, is not entitled to a mere allocation, but rather to the benefit of the total bargain as it relates to the bur-

dened lot. Babler restricted itself to meeting that requirement when it granted Gyurkey the right of first refusal on Lot 13.

■ If a seller were permitted to satisfy its obligation under a right of first refusal in the manner asserted by respondents here, even if done in good faith, not only would the preemptor be denied assurance that he was obtaining the same bargain on the lot as was the third party offeror, but the door would be opened to a myriad of unscrupulous endeavors designed to defeat preemptive rights of purchase by manipulation of lot prices within the terms of a larger sale. Consequently, we conclude that even though Babler separately valued Lot 13 as part of the total transaction, Lot 13 still could not be sold as part of a larger parcel as long as the lot was subject to Gyurkey's right of first refusal. *Cf. Thomas & Son Transfer Line, Inc. v. Kenyon, Inc.,* 40 Colo. App. 150, 574 P.2d 107 (1977) *aff'd* 196 Colo. 386, 586 P.2d 39 (1978) (disregarding, without discussion, separate pricing of lots in deciding upon remedy).

## IV

## REMEDY

Next to be resolved is the question of Gyurkey's remedy in this matter. Where the owner of property subject to a right of first refusal has sought to sell that property as part of a larger parcel, the majority of jurisdictions have held that the owner may be enjoined from making such a conveyance, and if the property has already been conveyed, the purchaser will be ordered to reconvey the encumbered property to the owner. At the same time, however, the majority rule also denies the preemptive rightholder the right to seek specific performance which would require the offering of the encumbered property to himself by the owner. The rationale behind the majority rule is that while the owner should not be permitted to defeat the preemptive right through a combined sale, he should not be compelled to sell the particular property when he has never received an offer, or intended to sell the property on the terms and conditions asserted by the preemptor. *Myers v. Lovetinsky, supra; Guaclides v. Kruse, supra; C & B Wholesale Stationery v. S. DeBella, supra; New Atlantic Garden v. Atlantic Garden Realty, supra; L. E. Wallach, Inc. v. Toll, supra; Atlantic Refining Co. v. Wyoming National Bank, supra;* see also Annot. 170 A.L.R. 1068 (1947).

■ As expressed by the majority rule, which we now approve and adopt, courts should not compel an owner to sell property on terms and conditions upon which he has not agreed or which he has not intended to accept. Such is also in keeping with the rule employed earlier in this opinion that a preemptor must precisely meet the terms and conditions of an offer if he is to exercise his preemptive right. Babler had not tentatively accepted an offer confined to Lot 13; however, it cannot be said that Babler's willingness to sell Lot 13 together with the other lots also amounts to a commitment to sell it separately at what a court might determine to be its fair market value.[1]

1. In *Garmo v. Clanton,* 97 Idaho 696, 551 P.2d 1332 (1976), the Thompsons, owners of a 42-foot strip of land to which they had given two parties, Carbon and Sather, a right of first refusal, agreed to sell that property to Garmo in conjunction with other nearby parcels. In an attempt to circumvent the right of first refusal, the Thompsons did not contract to sell the property to Garmo directly, but agreed to devise the strip of land to the purchaser, Garmo, as part of the total transaction. Some ten years later, following the death of the Thompsons, it was discovered that Thompson had devised the 42-foot strip to a grandson. Garmo brought suit against the estate for specific performance of his contract to devise the strip.

The holders of the preemptive right, Carbon and Sather, were joined, and they filed cross-claims and counterclaims, also seeking specific performance. The trial court determined that Carbon and Sather were entitled to an opportunity to purchase the strip of land for its fair market value as of 1975, the time of the Thompson/Garmo contract. We affirmed on the basis that the right of first refusal was enforceable, and that it was reasonable under the particular circumstances of that case, where many years had elapsed and the original optionors were deceased, that the optionee was entitled to purchase the strip of land at its fair market value. 97 Idaho at 699, 551 P.2d at 1335.

The proper remedy in this case is to enjoin the owners from selling Lot 13 until they receive an acceptable *bona fide* offer for Lot 13 unrelated to the sale of any other property, and give Gyurkey the appropriate notice and opportunity to meet such offer pursuant to the right of first refusal. We take care to note that such *bona fide* offer should be free from any hidden agreements or dealings which would in effect again tie the sale of the burdened property to the sale of other property so that the owner could pad the price of the burdened lot by making compensating adjustments to the value of other sales or transactions.

The judgment is reversed and the case remanded for further proceedings consistent with this opinion. Costs to appellant.

McFADDEN, J., concurs.

(McFadden, J., registered his vote prior to his retirement on August 31, 1982.)

BISTLINE, Justice, concurring in part.

It is true that at the time during which the facts of this controversy developed there was no precise statutory or case law available in Idaho which informed parties dealing in options (or rights) of first refusal what would be required for providing adequate notice of a proposed third-party sale. It is equally true that such was the situation when Judge Kramer heard and decided the resultant controversy. It would, therefore, be difficult to disagree with Justice Shepard's dissenting view in support of Judge Kramer's determination that the giving of notice to Gyurkey was adequate. Henceforth, with the forewarning of the various opinions which issue today, parties dealing with options of first refusal will clearly understand that, unless the option agreement itself spells out a different provision, it may be incumbent upon the option grantor to fully disclose, in writing, the exact terms of a proposed sale to a third party.

The larger problem in this case, however, is the substance of the notice given, and whether it conforms to the option agreement. Gyurkey's option was the right of first refusal on lot 13, which adjoined lot 14 which Gyurkey had earlier purchased outright. At the time Babler reached an agreement to sell lot 13 to a third party, he was obligated to so inform Gyurkey, and Gyurkey clearly had the right to buy on the same terms and conditions. Indeed, that is what options of first refusal are all about. In this instance, however, Babler did not actually have an offer on lot 13 which he intended to accept, but nevertheless notified Gyurkey that there was a pending offer for $50,000.

Babler's brief presents the contention that "[o]n the basis of Babler's familiarity with the lot in question and the appreciating market value of real estate in Ketchum, Idaho, Babler determined the fair market value of lot 13 to be Fifty Thousand Dollars"—from which it is said to follow that such a determination made in good faith, as the trial court so determined, is the end of the inquiry. At the same time in a symphony of self-contradiction, Babler cites *Aden v. Estate of Hathaway,* 162 Colo. 311, 427 P.2d 333 (S.Ct. en banc 1967)[1] for the proposition that that "Court concluded that it was not proper for it to make the determination for the owner as to what the smaller tract was worth." Yet Babler contends it was permissible for him to do so—a proposition in no way encompassed by the option agreement.

---

1. *Aden* is a unanimous decision from a respectable court and supports my view coinciding with Babler's that the courts are without authority to determine the price at which he must sell. The underlying factual situation is practically identical; although *Aden* involved an offer to buy the larger tract and the owner did not relate to his optionee a proposition that there was an offer on the included component at a price fixed by the owner. The optionee sought to compel a sale (at a proportionate price) of the included component upon which he held the option of first refusal—his theory being that the owner had agreed to let go of the property. The *Aden* court followed the reasoning of *Guaclides v. Kruse,* 67 N.J.Super. 348, 170 A.2d 488 (App.Div.1961) to which latter case reference is made for an exhaustive and well-reasoned discussion of the principles involved here—and one which should satisfy the most inquisitive minds as to their validity.

I am of the view that the judgment below must be reversed because Babler had no right to separately set a price for lot 13, but was required to pass on to Gyurkey any bona fide offer on lot 13 which a third party offered. Hence, I accept for this case that, as may be the custom in Ketchum, such a bizarre method of communicating a pending offer as employed here suffices. For future cases I agree with Justice Bakes that "[t]he preemptor, under a right of first refusal requiring acceptance on the same terms and conditions, is entitled to no lesser means of receiving the offer than is provided to the seller by the third party offeror." I am concerned, however, that this statement is not sufficiently all-encompassing for application to the varying manners of third-party offers. Certainly, the pre-emptor is entitled to "no lesser means." But there will be occasions when the preemptor is entitled to more. A written offer should be passed on intact once it has been received and the optionor has made the decision to accept it. If the written offer is not the complete understanding between the optionor and the third party, then any further details should be added to the written notice informing the optionee of the third-party offer received by the optionor and his intent to accept it. This rule should also prevail in any situation where the third-party offer is not in writing. It should be incumbent upon the optionor, absent any contrary written agreement covering content and service of the notice, to make a full and complete disclosure of his pending transaction with the offering third party. A rule requiring such will be more in accord with requirements of fair dealing. Although the parties to the option agreement ordinarily are not in a fiduciary position as to each other, that which was written by Judge Lumbard in *Funk v. Tifft,* 515 F.2d 23, 25 n. 2 (9th Cir. 1975), seems applicable:

"[Where a broker] failed to make adequate disclosures to the [buyer,] such disclosures should be required. This sort of disclosure requirement finds its analogy in many areas of our law today, especially in statutory enactments designed to protect the unknowing individual from the

professional. See, e.g., Truth-in-Lending Act, 15 U.S.C. §§ 1601–65; Securities Act of 1933, 15 U.S.C. §§ 77a–77aa; Interstate Land Sales Full Disclosure Act, 15 U.S.C. §§ 1701–20."

Notwithstanding the fact that Babler had no separate transaction pending for the sale of lot 13, but rather was engaged in selling it along with other property which he owned, (which would thereby deny Gyurkey an opportunity to realize upon his option) Gyurkey would have us fashion a rule that Babler must now sell the property to Gyurkey on a "proportionate" price basis. I do not agree. The rationale seems to be that because Babler violated one agreement by unilaterally setting the fair market value on lot 13, he must suffer having foisted off onto him a purchase price of the Court's own manufacture—a proposition which runs counter to numerous decisions of most courts, including this one. Two wrongs do not make a right, however.

The sale to the third parties is in derogation of Gyurkey's rights, and must be set aside. At such time as Babler hereafter receives a bona fide offer for the purchase of lot 13, he must in writing so notify Gyurkey who will then have five business days in which to signify in writing notice of his intent to purchase on and acceptance of those same terms and conditions. *Aden, supra; Guaclides, supra.* Based on further evidence, and new findings and conclusions to be entered, Gyurkey may be entitled to judgment for any damages suffered by Babler's actions, including attorney's fees, both in the trial court and in this Court where he has pursued his right to a correct decision in the trial court. The trial court's Findings of Fact 15 and 16, and Conclusions of Law 3 and 6 should remain, but Conclusion 4 should be set aside. I concur in the opinion of Justice Bakes insofar as it reverses the dismissal. Although I do not see the necessity thereof, I concur in the holding that an injunction may issue. I join, too, in awarding costs to appellant Gyurkey.

SHEPARD, Justice, dissenting:

The majority plows new ground in the law of a right of first refusal. It holds that

a holder of a right of first refusal must be given *written* notice. It further holds that such notice must include information of transactions far beyond the property which is subject to the right of first refusal. I find no support for those conclusions in the law of this or any other jurisdiction. The majority sidesteps the fact that this matter was tried and following trial, lengthy and comprehensive findings of fact were entered. In my judgment those findings are supported by sufficient and competent evidence. The entire theme of the majority runs directly contrary to those findings of fact.

The facts are relatively simply stated. In connection with a prior purchase, agents for Gyurkey drafted and presented to Babler a right of first refusal for lot 13. Babler signed that document. Nowhere therein is it specified that any particular form of notice is required either by the owner or the holder of the right of first refusal. Thereafter Gyurkey offered to purchase lot 13 for $33,000. That offer was refused by Babler, presumably because the price was too low. Gyurkey himself alleges that lot 13 has a unique value because of its location immediately adjacent to other commercial establishments. Babler received an offer to purchase all of the six lots from Barovetto, et al., with the consideration therefor being the construction of a house. Babler informed the prospective purchasers of Gyurkey's right of first refusal on lot 13, and the necessity therefor to determine the market value of lot 13 and set a price thereon. That market value was in good faith determined to be $50,000. Gyurkey was apprised of the market value of lot 13, and advised that he could exercise his right of first refusal at that price. Gyurkey acknowledges that he received such notice, but he refused to exercise his right of first refusal at that price and so advised Babler. Thereafter, Babler received another offer to purchase the six lots from a non-party to this action for the sum of $300,000.

Gyurkey brought this action seeking as relief that he be granted the right to purchase lot 13 for $30,000. Therein Gyurkey alleged that Babler and the other defend-ants conspired and acted in concert to "maliciously and fraudulently deprive the plaintiff of his contractual right to purchase lot 13".

Following trial, the court specifically found and concluded that the defendants did not act so as to defraud Gyurkey of his rights of first refusal to purchase lot 13. The trial court further found "on the basis of Babler's familiarity with the lot in question and the appreciating market value of real estate in Ketchum, Idaho" that in January of 1978 Babler had determined "that the fair market value of lot 13 was $50,-000." Undoubtedly a part of that finding was based on and is supported by the trial court's additional finding that there was an additional offer to Babler from Sound Development, Inc. to purchase the six lots at a price of $300,000. The trial court further found and concluded that Gyurkey had received adequate, sufficient, legal and actual notice to exercise his right of first refusal and had refused to exercise that right.

The right of first refusal is a form of option. *Garmo v. Clanton,* 97 Idaho 696, 551 P.2d 1332 (1976); *Atchison v. City of Englewood,* 193 Colo. 367, 568 P.2d 13 (1977); *Myers v. Lovetinsky,* 189 N.W.2d 571 (Iowa 1971). However, a right of first refusal cannot be utilized to require an owner to sell property but if an owner is willing to sell, it entitles the holder of a right of first refusal to buy the property on the terms offered to the seller by a third party. *Garmo v. Clanton, supra; Atchison v. City of Englewood, supra.* Unless a contract specifies the type of notice to be given to an option holder, no particular type of notice can be demanded. *Vozar v. Francis,* 579 P.2d 1056 (Alaska 1978); *Figge v. Clark,* 174 N.W.2d 432 (Iowa 1970); *Killam v. Tenney,* 299 Cr. 134, 366 P.2d 739 (1961); *Taylor v. Hartman,* 370 Pa. 146, 87 A.2d 785 (1952). Oral notice of an intent to exercise an option has been held to be sufficient. *Vozar v. Francis, supra; Figge v. Clark, supra; Steele v. Northup,* 259 Iowa 443, 143 N.W.2d 302 (1966); *Taylor v. Hartman, supra. See also White v. Ralph,* 66 Idaho 38, 154 P.2d 167 (1944). Although most of the

authorities deal with the ability of an option holder to give the seller oral notice of his intent to exercise an option, it is clear to me that the law should cut both ways and if an option holder is entitled to give oral notice in the absence of a contract provision to the contrary, then a seller should equally be entitled to give oral notice.

Neither Gyurkey nor the majority argue that Gyurkey's right of first refusal on lot 13 gave or gives him the right to purchase all the property on the same terms that the buyers obtained. *See Myers v. Lovetinsky,* 189 N.W.2d 571 (Iowa 1971); *Guaclides v. Kruse,* 170 A.2d 488 (N.J.Super.App.Div. 1961). Thus the transmission of the entire offer for all the properties would not benefit Gyurkey. Nevertheless the majority holds that Babler should have transmitted the details of the entire transaction to Gyurkey. It is clear that the terms of the entire transaction are useless to Gyurkey unless it reveals that the price for lot 13 was set fraudulently or with intent to deprive him of the right of first refusal. Here, as aforesaid, the court found that there was no such fraud or intent to deny Gyurkey the opportunity to exercise his right. The court found that the price was set in good faith and represented the fair market value of lot 13. *See O'Connell v. Weitzman,* 168 Cal.App. 400, 336 P.2d 592 (1959).

Even assuming arguendo that Gyurkey was entitled to receive the terms of the entire transaction, it is clear that before the conveyance to the buyers took place, Gyurkey did receive a copy of the agreement. Thereafter, Gyurkey did not act to assert his right to purchase the property within the five-day period required in the contract which Gyurkey had drafted. Thus the majority holds that after notice has twice been given to a holder of a right of first refusal and the holder has twice declined to exercise the right, it still is somehow contingent on further refinements of an agreement with other parties. No support for that conclusion is cited, and I find none. *See O'Connell v. Weitzman, supra.* If there had indeed been fraud and an intent to deprive Gyurkey of his right of first refusal then of course, the notice could be disregarded.

*See Tamura v. DeIuliis,* 203 Or. 619, 281 P.2d 469 (1955).

In *Garmo v. Clanton,* 97 Idaho 696, 551 P.2d 1332 (1976) a unanimous court defined the rights of a holder of a right of first refusal when the owner of the subject property sought to transfer it to a third party as a part of a larger transaction. Stripped of all its irrelevancy, that decision held that the holder of the right of first refusal was entitled to notice and the opportunity to purchase the subject property at its fair market value as of the time of the contemplated transaction with the third party. In the instant case Gyurkey was given notice and the opportunity to purchase the subject property at the market value as of the time of the proposed transaction with the third parties. In my opinion, the result obtained by the majority here is in direct contradiction to *Garmo* and requires the overruling of *Garmo.*

I believe the majority's reliance upon *Brenner v. Duncan,* 318 Mich. 1, 27 N.W.2d 320 (1947) is misplaced. In *Brenner* the property at issue was a portion of a single 100-foot parcel. After a sale of the entire 100-foot parcel was made, the preemptive right holder was granted his right to purchase a portion of that 100-foot parcel. In *Brenner* there was no issue of separate pricing as exists in the instant case. The court in *Brenner* expressly stated, "[t]he terms of the lease imposed upon Helen E. Randall a duty, before selling to the defendants Powers, to fix a specific sum as the amount at which she was willing to sell the premises in question [the property subject to the right of first refusal] and to afford the plaintiffs an opportunity to buy the same at such figure. Her failure to do so constituted a breach of contract...." *Id.,* 27 N.W.2d at 322. Clearly Babler did precisely that in the instant case. Babler set a price upon the property which was subject to the right of first refusal, which was the fair market value of the property, and Gyurkey was given notice and the opportunity to purchase, which he declined to do.

In my judgment, the decisions of other courts uniformly turn on the good or bad faith of the seller in setting an acceptable price. *See Myers v. Lovetinsky,* 189

N.W.2d 571 (Iowa 1971); *Smith v. Traxler*, 228 S.C. 418, 90 S.E.2d 482 (1955). *See also Weber Meadow-View Corp. v. Wilde*, 575 P.2d 1053, 1055 (Utah 1978) where that court stated: "the decision as to both the time and the terms upon which the optionor would sell her property remains her exclusive prerogative so long as she acts in good faith and without any ulterior purpose to defeat the right of the optionee."

The thread running through the entire majority opinion is that a rule must be fashioned which will prevent fraud and unfair dealing which has as its purpose the defeat of the right of the holder of the right of first refusal. It is enough to say that such issue was specifically alleged by Gyurkey, was the subject at trial, and the district judge, based on substantial evidence, ruled against Gyurkey on that issue.

I would affirm the judgment of the district court.

DONALDSON, J., concurs.