**In re FRIDAY AFTERNOON, INC., Debtor.**

**Raymond H. REEF, Trustee of Causcan Realty Trust, Plaintiff,**

v.

**FRIDAY AFTERNOON, INC., Defendant.**

**Bankruptcy No. 86–10838–JNG. Adv. No. 86–1453.**

United States Bankruptcy Court, D. Massachusetts.

May 27, 1987.

---

[*] The Court finds that any increase in the Austins' legal expenses due to this situation was *de minimis.*

W. Bradley Ryan, Rubin & Rudman, Boston, Mass., for plaintiff.

Francis J. DiMento, DiMento & Sullivan, Boston, Mass., for defendant.

## MEMORANDUM

JAMES N. GABRIEL, Chief Judge.

On November 26, 1986, Raymond H. Reef, Trustee of Causcan Realty Trust ("Causcan" or the "Plaintiff") filed a complaint, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001(a), seeking a declaratory judgment that Friday Afternoon, Inc. (the "Debtor") failed to properly exercise a right of first refusal contained in its lease with Causcan. The Debtor responded to the complaint on January 13, 1987. The Court conducted an evidentiary hearing on April 7, 1987. At that time, stipulations as to agreed facts were filed and four witnesses testified, including Hossein Talakoub, Raymond H. Reef, Barry Bornstein and Steven B. Gasperoni. The Court took the matter under advisement and directed the parties to submit briefs by April 22, 1987.

## FACTS

Causcan is the owner of property in Boston's North Station area known as 168–170 Canal Street, Boston, Massachusetts. Causcan purchased the property subject to the Debtor's lease from Arthur A. Siegal and Bernard Berkman, trustees of 170 Ca-

nal Street Realty Trust, on September 17, 1984. Prior to Causcan's purchase of the property, the Debtor and the trustees of 170 Canal Street Realty Trust had entered into a written lease agreement which contained a right of first refusal. Paragraph 22(a) of the Debtor's lease provides:

*[I]t shall have the right of first refusal to accept any offer by the Lessor to sell the building of which the demised premises are a part or to meet any bona fide offer of a third person for a period of thirty days after a written notice of such offer from the Lessor.* During said 30 day period the Lessee shall accept or reject the offer and if it shall accept the parties shall agree on the sales price and execute a purchase and sale agreement within said 30 day period which will provide a closing in or within 60 days from the date of execution of the purchase and sale agreement. In the event the parties fail to agree on the sales price or fail to execute a purchase and sale agreement as aforesaid the Lessor shall thereafter be free to sell the premises free and clear of any claims of Lessee thereto....

(emphasis supplied).

On May 7, 1986, Causcan entered into a purchase and sale agreement with Hossein and Ali Talakoub of Belmont, Massachusetts, in which Causcan promised to sell and the Talakoubs promised to buy the Canal Street property for $1,150,000. On the same day, Causcan entered into another purchase and sale agreement with the Talakoubs in which it promised to sell and they promised to buy another property owned by Causcan located at 125–133 Causeway Street in the North Station area for $1,425,000.

The May 7, 1986 agreements between Causcan and the Talakoubs were amended twice. The first amendment, dated May 8, 1986, provides in relevant part:

Notwithstanding any provisions in both agreements to the contrary, except as otherwise provided herein the rights and obligations of the Buyer to buy and the Seller to sell as provided in each of the Canal Agreement and the Causeway

Agreement is contingent on the simultaneous sale and purchase of the property in the other agreement. A default under one of the agreements shall be deemed a default under the other agreement thereby permitting the exercise of all rights in the event of default as set in both agreements.

The second amendment, dated July 30, 1986, eliminated the mutual dependence of the two purchase and sale agreements.

By letter dated May 8, 1986, John D. Kalish, Esq. ("Kalish"), attorney for Causcan, gave the Debtor notice of the Talakoubs' offer and attached a copy of the purchase and sale agreement for the Canal Street property only. Kalish did not inform the Debtor of the purchase and sale agreement for the Causeway Street property or the May 8, 1986 agreement linking the two offers.

The Debtor responded to Kalish's letter through its attorney Vincent J. DiMento ("DiMento") on May 20, 1986. DiMento, on behalf of his client, requested "assurances that the contemplated sale of the premises is not tied in, directly or indirectly, to any other purchase or sale" and asked that Causcan and the prospective purchasers "represent and warrant that there are no tie-in sales or other considerations of any kind involved and that the Purchase and Sale Agreement dated May 7, 1986, represents the entire understanding between the parties." DiMento's letter concluded with the representation that "with these assurances in hand, our client will then be in a position to reply promptly to your notice." The letter in no way purported to exercise the Debtor's right of first refusal.

Causcan did not respond to the Debtor's request for assurances, and, in the fall of 1986, Causcan conveyed the Causeway Street property to the Talakoubs. The sale had been delayed because the Talakoubs were waiting for a financing commitment from their bank and because of a *lis pendens* on the property stemming from an unrelated civil action. The *lis pendens*, which was obtained on August 13, 1986, was removed approximately one month later. Shortly thereafter on November 17, 1986, Causcan conveyed the Causeway Street property to the Talakoubs for $1,425,000.

At the trial, Hossein Talakoub testified that he remained willing to purchase the Canal Street property for $1,150,000. He also described the Causeway Street and Canal Street properties and indicated that he thought the purchase prices allocated to the properties were fair. Raymond Reef also testified about the properties. He revealed that the Causeway Street property, in terms of square footage, was larger than the Canal Street property, and that the purchase prices for the properties were fixed by evaluating that factor as well as others such as land area, street access and potential for expansion. As the owner of other properties in the North Station area and as a beneficiary of Causcan, he testified that the purchase prices specified in the March 7, 1986 purchase and sale agreements were fair and reasonable. Stephen B. Gasperoni, an independent real estate appraiser, appraised the Canal Street property and corroborated Reef's and Talakoub's testimony. He concluded that the fair market value for the Canal Street property, as of March 7, 1986, was $1,300,000.

## DISCUSSION

Through its complaint, Causcan requests that the Court enter a declaratory judgment 1) that DiMento's letter of May 20, 1987 was not an exercise of the Debtor's right of first refusal; 2) that the Debtor failed to exercise its right of first refusal within thirty days of being notified of the Talakoubs' offer; 3) that the Talakoubs' offer is a bona fide offer; and 4) that Causcan is free to sell the Canal Street property to the Talakoubs pursuant to the May 7, 1986 purchase and sale agreement.

The evidence presented at the evidentiary hearing clearly warrants the entry of a declaratory judgment in favor of Causcan with respect to its first three requests. However, in view of the May 8th agreement linking the sales of the two properties, an issue exists as to whether Causcan

is free to sell the Canal Street property to the Talakoubs.

The Debtor maintains that it was not given an opportunity to consider an offer on the same terms and conditions as the Talakoubs' offer. It asserts that because it was not apprised of the purchase and sale agreement for the Causeway Street property and the May 8, 1986 agreement linking the two sales it is entitled to a full thirty days to consider an *identical* offer made by a third party. The specific remedy the Debtor seeks is set forth in its supplemental memorandum that provides:

> If awarded the requested thirty (30) days to exercise its right of refusal, it is the debtor's intention, during that period to negotiate an agreement to buy the space [as a condominium] from the Talakoub brothers or failing that, to seek another party willing to finance debtor's purchase of the fee and buy from debtor all but debtor's space. If debtor fails in both these alternatives, it will then be confronted with only one remaining possibility: to buy the fee and carry the property indefinitely until a condominium developer can be found....

The first question that the Court must address is whether Causcan complied with the notice provisions of paragraph 22(a) of the lease. Stated another way, the Court must determine whether the Debtor was entitled to know about the purchase and sale agreement for the Causeway Street property and the May 8, 1986 agreement which conditioned the sale of the Canal Street property on the sale of the Causeway Street property and contained a variety of other provisions.

In an effort to convince the Court that it is entitled to know about the Causeway Street purchase and sale agreement and the May 8th agreement, the Debtor emphasizes variations in the deal offered the Debtor by Causcan and the deal between Causcan and the Talakoubs. Specifically, the Debtor notes that it would have been required to buy the property subject to the tenancy of Canal Street Package, Inc., another lessee of Causcan in the Canal Street property, whereas the Talakoubs were given a rental guarantee and assured that the tenancy would not extend beyond January 31, 1987. In its trial memo, but not in its supplemental memorandum, the Debtor highlights other variations including 1) the time for obtaining a mortgage commitment and 2) possible termination of the agreement if the Canal Street property is found to contain hazardous waste.

Causcan suggests that the variations deemed to be "very significant" by the Debtor are really insignificant, non-material variations that did not place the Talakoubs in a more favorable position than the Debtor. For example, Causcan notes that the May 8, 1986 agreement between the Talakoubs and Causcan provided for a maximum of 60 days from May 8, 1986 to obtain a mortgage commitment, whereas the provisions of paragraph 22(a) gave the Debtor up to 90 days to obtain a mortgage commitment.

With respect to the provision in paragraph 5 of the May 8, 1986 agreement permitting the liquor store to continue its tenancy through January 31, 1987 at a monthly rental of $2000 per month plus the tenant's share of costs related to occupancy, Causcan points out that the tenant, an entity related to it was a tenant at will and the provision in the May 8, 1986 agreement benefitted Causcan not the Talakoubs.

Moreover, with respect to the hazardous waste provision, Causcan asserts that that provision, as a practical matter, did not expand the rights of either the Talakoubs or the Debtor, assuming the Debtor exercised the option, because a clean Ch. 2E report, *see* Mass.Gen.Laws Ann. Ch. 21E (West 1981 & Supp.1987), and affirmative title coverage with regard to Ch. 21E would be bank lending requirements.

Causcan, relying on *Kanavos v. Hancock Bank & Trust Co.,* 395 Mass. 199, 479 N.E.2d 168 (1986) also suggests that the Debtor has the burden of showing that it was ready willing and able to purchase the Canal Street property on the terms offered by the Talakoubs. In the *Kanovos* case, the Supreme Court of Massachusetts held that at least in the context of a right of first refusal to purchase stock the holder of

the right of first refusal had the burden of proving his financial ability to purchase the stock.

The court framed the issue in *Kanavos* as follows:

First, if, for valid consideration, the owner of stock [Hancock] in a corporation has agreed to give A [Kanavos] the opportunity to purchase that stock at the price at which the owner intends to sell it to another in the future (a right of first refusal) but the owner instead sells the stock to a third party without giving A the opportunity to match the third party's offer and thus acquire the stock, does A's right to recover in an action for breach of contract in any way depend on whether A had the financial ability to purchase the stock during the relevant time? Second, if A's right does depend, as we conclude it does, does A have the burden of proving his financial ability to perform or is the burden on the repudiating stockholder to prove A's ability to perform?

479 N.E.2d at 169. The court determined that "[t]he general rule is that the plaintiff must prove his ability to perform his obligations under a contract of the type involved here." *Id.*, 479 N.E.2d at 172. It concluded that:

The burden was on Kanavos to prove his ability to finance the purchase of the stock. The fact of his ability to do so was an essential part of establishing the defendant's liability. Circumstances concerning his ability to raise $760,000 for the stock were far better known to him than to the bank. It is, of course, true that the bank created the problem by selling the stock to another in violation of its contractual obligation, and one could argue that, therefore, it should take the risk of failing to establish Kanavos's inability to purchase the stock. Such an argument, however, has not been generally accepted, for to do so would in effect place on the defendant the burden of disproving a fact essential to the plaintiff's case.

*Id.*

The Court agrees with Causcan that to the extent that the Debtor has the burden of proving its ability to perform, i.e., to purchase the Canal Street property, it failed to meet that burden.

In *Northwest Television Club, Inc. v. Gross Seattle, Inc.*, 26 Wash.App. 111, 612 P.2d 422 (1980), *aff'd in part, rev'd in part*, 96 Wash.2d 973, 634 P.2d 837 (1981), the court articulated general principles with respect to rights of first refusal when it stated:

A right of first refusal to purchase leased property is distinguishable from an option in that a first refusal right has no binding effect unless the offeror decides to sell. A right of first refusal to purchase is a valuable prerogative, limiting the owner's right to freely dispose of his property by compelling him to offer it first to the party who has the first right to buy. The purpose of a right of first refusal to purchase leased property is to protect the lessee's interest in its continued possession of the premises, and to encourage the lessee to make improvements it might otherwise not make.

612 P.2d at 425 (citations omitted).

The Supreme Court of Idaho considered a case similar to the instant case in *Gyurkey v. Babler*, 103 Idaho 663, 651 P.2d 928, 34 A.L.R. 4th 1199 (1982). In that case, the plaintiff had purchased a lot in a subdivision from the defendant, a development company. The plaintiff's purchase and sale agreement contained a right of first refusal on an adjoining lot, known as lot 13. The development company executed an earnest money agreement with three individuals with respect to six lots including the lot on which the plaintiff had right of first refusal. The development company placed a separate value on each of the six lots. The plaintiff, through his agent, was orally informed of the pending sale and only later was given a copy of the written agreement. The plaintiff was unable to exercise his right of first refusal and so informed the development company. Subsequently, the plaintiff sued the owners of the development company alleging that he had not been notified of any bona fide offer.

The court ruled that the holder of a right of first refusal

> cannot be called upon to exercise or lose that right unless the *entire* offer is communicated to him in such a form as to enable him to evaluate it and make a decision. In most transactions, as is the case here, the seller receives a *written* offer to purchase setting forth the terms and conditions of the offer. The preemptor, under a right of first refusal requiring acceptance on the same terms and conditions, is entitled to no lesser means of receiving the offer than is provided to the seller by the third party offeror.

651 P.2d at 931. In *Gyurky*, the court ruled that the plaintiff's receipt of a relayed oral communication, instead of a copy of the written offer, was "insufficient both in form and substance." 651 P.2d at 936. The court also concluded that the sale of the lot upon which the plaintiff had a right of first refusal as part of a larger transaction, even though separately priced, denied the plaintiff the right to purchase on the same terms and conditions as the defendant intended to accept. The court concluded that:

> If a seller were permitted to satisfy its obligation under a right of first refusal in the manner asserted by [the defendant] here, even if done in good faith, not only would the preemptor be denied assurance that he was obtaining the same bargain on the lot as was the third party offeror, but the door would be opened to a myriad of unscrupulous endeavors designed to defeat preemptive rights of purchase by manipulation of lot prices within the terms of a larger sale.

*Id.* at 933. As a result of this ruling, the court enjoined the defendants from selling the lot upon which the plaintiff had a right of first refusal until they received an acceptable bona fide offer unrelated to the sale of any other property and gave the plaintiff appropriate notice and an opportunity to meet such offer. The court added "that such *bona fide* offer should be free from any hidden agreements or dealings which would in effect tie the sale of the burden property to the sale of other property so that the owner could pad the price of the burdened lot by making compensating adjustments to the value of other sales or transactions." *Id.* at 934.

In a well reasoned dissent, Justice Shepard criticized the majority for plowing new ground in the law with respect to rights of first refusal. He noted that neither the plaintiff nor the majority argued that the plaintiff's right of first refusal gave the plaintiff the right to purchase all six lots. As a consequence, he perceived that the transmission of the entire offer for all the properties would not benefit the plaintiff. He stated:

> [i]t is clear that the terms of the entire transaction are useless to Gyurkey unless it [sic] reveals that the price for lot 13 was set fraudulently or with intent to deprive him of the right of first refusal. Here ... the court found that there was no such fraud or intent to deny Gyurkey the opportunity to exercise his right. The court found that the price was set in good faith and represented the fair market value of lot 13.

*Id.* at 937. Judge Shepard concluded that any decision should turn on the good or bad faith of the seller in setting an acceptable price.

In the absence of Massachusetts law directly on point, this Court chooses to agree with Justice Shepard in *Gyurkey*. Since the Debtor has no right to purchase both properties, *see Thomas & Son Transfer Line, Inc. v. Kenyon, Inc.*, 40 Colo.App. 150, 574 P.2d 107 (1977), *aff'd*, 196 Colo. 386, 586 P.2d 39 (1978); *Aden v. Estate of Hathaway*, 162 Colo. 311, 427 P.2d 333 (1967), the terms of the sale of the Causeway Street property were of no value to it. Moreover, the remaining provisions in the May 8, 1986 agreement cannot be said to materially affect the purchase and sale agreement for the Canal Street property that was transmitted to the Debtor. To the extent that the Debtor expresses a legitimate concern about the possibility of price manipulation, the Court notes that paragraph 22(a) is susceptible of being interpreted to permit negotiations relative to the sales price since it provides that "during said thirty day period the Lessee shall ac-

cept or reject the offer and if it shall accept the parties *shall agree on the sale price* ...." (emphasis supplied).

Additionally, the Court is persuaded by the fact that the Debtor did not challenge the fairness of the purchase price agreed upon by Causcan and the Talakoubs and presented no evidence that it was ready and able to proceed with the sale.

In view of the foregoing the Court declares that Causcan is free to sell the Canal Street property to the Talakoubs pursuant to the May 8, 1986 purchase and sale agreement.