Rappaport v. Banfield, No. 80-2-03 Wncv  (Teachout, J., May 1, 2003)

[The text of this Vermont trial court opinion is unofficial.  It has been reformatted from the original.  The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT
WASHINGTON COUNTY, SS.

JEROME RAPPAPORT          )
                                       )
        VS.                 )                  Washington Superior Court
                                       )                  Docket No. 80-2-03 Wncv
LAURA BANFIELD AND      )
DUANE WELLS              )

**Findings and Conclusions**
**Motion for Preliminary Injunction**

Plaintiff Jerome Rappaport, holder of a right of first refusal on a portion of the lands owned by Defendant Laura Banfield, seeks to enjoin the sale of all her real estate to a prospective purchaser, Defendant Duane Wells, on the grounds that the price allocation between the two contracts for the sale of her property (portions of her holdings which are and are not subject to his right of first refusal) is unjustifiable, and deliberately and wrongfully designed to defeat his exercise of the right he holds.  He seeks a preliminary injunction and court intervention to correct the alleged disproportionate price allocation.

This matter came before the court for hearing on the request for a preliminary injunction on April 7, 8, and 17, 2003.  Plaintiff is  represented by Michael Marks, Esq.  Defendant Laura Banfield is represented by Oreste V. Valsangiacomo, Esq., and Defendant Duane Wells is represented by Bernard D. Lambek, Esq.

Plaintiff Jerome Rappaport is a resident of Florida, and the owner of approximately 600-700 acres of farmland located in East Montpelier, Vermont, which he has acquired in various purchases starting in 1970.  He is a 1949 graduate of Harvard Law School who has been a successful lawyer and real estate developer in Boston.  He has maintained farming operations on his East Montpelier lands, and has cherished the time he spends in Vermont for a variety of reasons.  A portion of his property is adjacent to lands and a house that was owned by Ed and Laura Banfield until Ed Banfield died some time ago, and is now owned solely by Laura

Banfield. He met Ed Banfield in 1963 when he was a student working on a Masters in Public Administration at the Littauer Center (now the Kennedy School of Government) in Cambridge, Massachusetts, and Ed Banfield was his professor. A strong relationship developed, and Mr. Rappaport visited the Banfields in Vermont regularly at their second home property in East Montpelier over many years. For several years he lived in the Banfields' Vermont house for part of each year. Mr. Rappaport and the Banfields shared a love for their properties in Vermont and held other interests in common as well as having a long term friendship.

Defendant Laura Banfield is a resident of New York, New York, and the present owner of the property in East Montpelier, Vermont that is the subject of this suit. She is the surviving spouse of Ed Banfield. It has become difficult for her to travel to Vermont to enjoy the property, and she wishes to sell it. The property consists of a house on a 1.8 acre parcel (Parcel 4), an adjacent 1.0 acre parcel (Parcel 3), another adjacent parcel of 25.1 acres (Parcel 2), and a fourth parcel across the road consisting of 50.4 acres (Parcel 1), for a total of 78.3 acres. The house is an elegant 1790 federal house and is situated about 60-75 feet away from the boundary line of the 25.1 acre parcel. From the house one looks out over the 25.1 acre piece, which is open land in agricultural use, toward spectacular long distance views of open land with the Worcester range, Camel's Hump, and other mountains in the background. There is also a pond on the 25.1 acre piece. The 50 acres across the road and on the opposite side of the house is mostly woods and there is no view in that direction. Ed and Laura Banfield spent considerable time at the property over the years. They purchased the house parcel in 1951, the 50 acres across the road in 1953, the one acre adjacent to the house parcel in 1955, and the 25.1 acres which provides the spectacular views in 1963. While the acreages and boundaries can now be identified because of a recent survey, none of the parcels were surveyed before November 2002. The property was listed in town records as consisting of 84 acres.

Defendant Duane Wells is a resident of East Montpelier, Vermont. He grew up and attended school and college in central Vermont, and liked the Banfield property from the time he was a child, when he called it the "Captain Kidd place." He was an elementary school principal before becoming a builder in 1975, which has been his occupation since. He met the Banfields in approximately 1980 when he did some work for them on their house. He was employed by them between 1980 and 2002 to work on their house and pond at various times. He shared with them their attachment to the property and became friends with them. He found them interesting people and enjoyed their guests. The Banfields rented their house to his present wife for a short period of time when she was in transition, and she is also fond of the property. He had expressed to the Banfields his interest in buying their property at some point.

In 1963, the Banfields bought the 25.1 acre piece (then unsurveyed) from Alfred Knowles, a local farmer who used it for animals and crops. Mr. Knowles conveyed it to the Banfields subject to a reserved right of first refusal and agricultural easement. The conveyance from Knowles to Banfield is dated October 31, 1963 and recorded in Volume 20 at Page 499 of the East Montpelier Land Records. The reservation of the right of first refusal is set forth in the following language:

2

In the event of the sale of this property by the grantees, their heirs or assigns, the grantors and their heirs and assigns are to have the first right to purchase said property at the highest price offered to the grantees and their successors and assigns, said right to be exercised within thirty days after notice in writing of any offer to purchase.

The conveyance also reserved the following easement interest:
The grantors herein for themselves and their heirs, successors and assigns, reserve the right to grow and harvest crops and to pasture cattle on the land hereby conveyed . . .The right of grantors and their heirs and assigns to grow and harvest crops and to pasture cattle shall not be interpreted to prevent the erection by the grantees or their heirs or assigns of a permanent structure on the land so conveyed.

In 1969 or 1970, the Banfields learned that a real estate developer was seeking to buy the balance of the Knowles farm, adjacent to their 25.1 acres, and they approached their friend Mr. Rappaport with the opportunity to buy the Knowles farm. In a warranty deed dated March 23, 1970, and recorded in the Town of East Montpelier Land Records, Alfred W. and Pearl M. Knowles conveyed to Jerome Rappaport certain land and premises in the Town of East Montpelier adjacent to the Banfields' lands. Included in this conveyance was the Knowles' previously reserved right to harvest crops and pasture cattle on the land that the Banfields had bought in 1963 adjacent to their house, and the right of first refusal on the same lands. Thus, Mr. Rappaport held, and still holds, the right of first refusal on the 25.1 acre parcel, as well as the right to use that parcel to harvest crops and pasture cattle. He has done so and continues to do so. During the 1980's, his farms were used for the breeding of cattle, and his animals fetched very high prices at auctions, although overall the farms were not profitable. He takes good care of his farmlands, and the 25.1 acres has remained open and in active agricultural use. The Banfields benefitted from Mr. Rappaport's ownership in that his agricultural use not only maintained the views by keeping the land open, but it maintained the agricultural character of the landscape surrounding their property.

Mr. Rappaport erroneously believed that he held a right of first refusal on all of the Banfield property (which, as noted above, was unsurveyed), and not just the acreage that the Banfields acquired in 1963. He had always been interested in acquiring the entire Banfield property at such time as they no longer wished to own it. Not only did he have personal and emotional attachments to the Banfield property itself, but he was deeply attached to his East Montpelier land, and the Banfield property would link up two separate farms he had, creating continuity in his holdings. The 25.1 acre parcel in particular had previously been part of the Knowles farm, of which he owned the remainder.

3

In 2002 (which the court infers was after Ed Banfield had died and when Laura Banfield was not using the property as much), Mr. Rappaport hired James Thetford, an experienced central Vermont appraiser, to do an appraisal of the entire Banfield property. Mr. Thetford appraised it as of February 22, 2002 at $300,000. Mr. Rappaport offered to buy it for that amount.

In August of 2002, Laura Banfield told Mr. Wells of Mr. Rappaport's offer, and asked him what he thought. He said he thought it was worth more than that, and suggested that she obtain an appraisal or market information on her own behalf to determine its value. Laura Banfield contacted real estate broker Virginia Andrews of Century 21 Jack Associates. Ms. Andrews suggested listing it for $450,000, to which Laura Banfield agreed, and Ms. Andrews prepared a single listing agreement covering all of the Banfield land. There was no separate listed price established for the 25.1 acres that was subject to the Rappaport right of first refusal and agricultural easement. An addendum to the listing agreement, dated August 23, 2002, provided that three potential purchasers would have the opportunity to purchase the property prior to the property being submitted to the Multiple Listing Service at a reduced commission of 3%. The three potential purchasers listed were Jerry Rappaport, Danis Regal, and Duane Wells.

Following the execution of the listing agreement, Ms. Andrews called the three to notify them that they had until September 30th to make an offer before the property would be listed with the Multiple Listing Service. This date was later extended several times. Danis Regal never became involved in making a bid.

Ms. Andrews and Mr. Rappaport had their first direct conversation on September 19, 2002, although messages were exchanged prior to that date through Mr. Rappaport's assistant. Ms. Andrews mentioned needing to locate Mr. Knowles because of the outstanding right of first refusal, and Mr. Rappaport was the one who informed her that he had acquired that right from the Knowles. Mr. Rappaport understood from the conversation that Ms. Andrews intended to obtain the highest possible offer from one of the three initial offerees, and then take that price to the holder of the right of first refusal. While he wished to buy the property, he believed that he had the right to buy the entire property at the highest offer anyone else would make, and he did not want to bid against himself, and increase the price unnecessarily by bidding too high. He also knew that any third person buying the property would take it subject to his agricultural easement on the open fields, and would only be able to locate one structure on that portion and not have full control over it, and he calculated that the easement substantially affected the market value of the property. He did not believe that the property was worth the $450,000 for which it was listed. He told Ms. Andrews that he was interested but not at $450,000, and he noted that the house needed work, the property was on a back road, and the agricultural easement allowed only one structure to be built. At this time, the property had not yet been surveyed. He said he was willing to pay $400,000. He mailed Laura Banfield a copy of the appraisal from Mr. Thetford showing a fair market value of $300,000, as well as a summary of the fact of the restrictions, his right of first refusal, and his interest in buying the property, recognizing that it was his obligation to match the highest offer. At that time he erroneously believed that he held a

4

right of first refusal on the entire Banfield property. This misunderstanding was confirmed, not dispelled, by the fact that Ms. Andrews invited offers on the whole property as a single unit, and not just a particular portion. Thus he continued to assume that once an offer was received for the whole Banfield property, he would have an opportunity to exercise his right of first refusal.

Mr. Rappaport received a letter dated September 30, 2002 from Laura Hoguet, Laura Banfield's daughter and a New York attorney, who notified him that the sale was being handled on Laura Banfield's behalf by Vermont attorney Thomas Koch under a power of attorney and Ms. Andrews as realtor, and she asked him not to contact Laura Banfield, but to deal with Mr. Koch and Ms. Andrews.

In the meantime, when Duane Wells was notified of the availability of the property for sale, he went to the land records to research Laura Banfield's holdings. He discovered that an agricultural easement and right of first refusal applied only to one portion of the land, between 10-30 acres in size. At that time he did not know that it was held by Mr. Rappaport. He suggested that the property be surveyed, and during September and October, the Banfield property was surveyed.

On October 10, 2002, Mr. Rappaport and Ms. Andrews had a telephone conversation. Mr. Rappaport wanted to know Laura Banfield's response to his $400,000 offer. Ms. Andrews told him that of the three parties contacted, one other was interested and she expected to receive an offer once the survey was completed. Mr. Rappaport then said that his $400,000 offer was off the table. He questioned whether the other person knew that only one structure could be built on the land on which he held an easement, and he stated that he intended to exercise his right of first refusal. At this time, he continued to believe that he held a right of first refusal on all of the Banfield property. He noted to Ms. Andrews that she would have to send him any offer that was received. Ms. Andrews replied that she was aware that he had a right of first refusal. It is unclear whether she clarified in that conversation that his right only applied to a portion of the acreage, and not to the remainder, or whether she was even clear about that herself.

In early November of 2002, Mr. Wells received a preliminary draft of a survey of the parcel. Following discussions with the surveyor, Mr. Wells understood that the Rappaport right of first refusal and agricultural easement only applied to the 25.1 acre parcel that is shown as Parcel 2 on the survey. Mr. Wells also understood that the 1.0-acre parcel with a house, a 1.8-acre parcel, and a 50.4-acre parcel were not subject to the right of first refusal or agricultural easement. Mr. Wells knew that he had to make two offers because of the right of first refusal—one for the 25.1 acres subject to the right of first refusal, and another for the balance of the property. Ms. Andrews was away, but Mr. Wells left a message with her colleague that he wanted to make an offer for $400,000 under two separate contracts, one for the 25.1 acres and the other for the remainder. When Ms. Andrews returned, based on the message, she prepared two separate purchase and sale agreements, one for the 25.1 acres and the other for the balance of the property, prior to a scheduled meeting with Mr. Wells. She left the lines for the purchase prices blank on both drafts.

5

Mr. Wells met with Ms. Andrews on November 18, 2002. He said he was making a total bid of $400,000.00, with an allocation of $150,0000 to the land that was subject to the Rappaport right of first refusal and agricultural easement, and $250,000 allocated to the remaining 53.2 acres, including the house. He had calculated that he would put improvements of approximately $200,000 into the house, and he based his bid for the house partially on a calculation that $450,000 would be a reasonable value for it once the house was improved, even without the 25.1 acres. He also determined that if Mr. Rappaport exercised his right of first refusal, Mr. Rappaport would own both the easement and the land, and therefore the land could possibly no longer be subject to an agricultural easement. Because the local zoning was 3 acres, the 25.1 acres could potentially be subdivided into eight building lots. The enjoyment and value of the house to the Wells would be much greater if the 25.1 acres were left open. He wanted to make the price on the 25.1 acres as high as he could to prevent Mr. Rappaport from exercising his right of first refusal to protect the house and 53.2 acres. Mr. Wells had discussed this offer with his wife. His wife did not want to live in the house without adequate protection from development on the 25.1 acre parcel. Thus, Mr. Wells decided to try to make the proposal on the 25.1 acre parcel high enough so that Mr. Rappaport might not match it. Mr. Wells believed that the market value of the 25.1 acres was only $100,000.00 as a stand-alone parcel, and he knew that it was subject to the agricultural easement and that only one house could be built on it, yet the value to him was greater because of his attachment to the Banfield property as a whole, and the protection the 25.1 acres would provide to the investment that he and his wife would be making in the house and 53.2 acres.

Mr. Wells told Ms. Andrews of the terms he was offering, which was a total of $400,000 on the two separate contracts. Ms. Andrews knew that Laura Banfield had not accepted Mr. Rappaport's oral offer of $400,000. Therefore, she telephoned Laura Banfield, who said she would agree to sell to Mr. Wells if Ms. Andrews could get a total of $425,000 from him. Ms. Andrews told Laura Banfield that the offer was in two parts, but Ms. Banfield said nothing about the allocation of the $425,000 she was willing to accept. Ms. Andrews then advised Mr. Wells that if the price were improved by $25,000.00 to $425,000.00, Ms. Banfield would accept his offer. She said nothing about how the additional amount might be allocated between the two contracts.

Mr. Wells believed that he had pushed the amount that could be allocated to the 25.1 acre parcel to the limit, since $150,000.00 was $50,000.00 more than its market value in his own mind. Nonetheless, he was willing to increase his overall offer by $25,000. In addition, he decided that he was still willing to pay $275,000 for the house and 53.2 acres, even if he did not wind up owning the 25.1 acre piece. Thus, he decided to add the requested $25,000 to his offer for the house and remaining land, knowing that this would be the price for it whether or not he was also able to purchase the 25.1 acres. He directed Ms. Andrews to prepare written offers on that basis, which he signed. At no time did Ms. Andrews suggest what the allocation should be, nor did she question the allocation that Mr. Wells made. At no time did Mr. Wells have any discussion with Laura Banfield or Mr. Koch about allocating the total offer between two

6

contracts. Mr. Wells did not make the contract to purchase the house and 53.2 acres contingent on his ability to purchase the 25.1 acres. Mr. Wells signed the two offers to purchase. They were both contingent on Mr. Wells' ability to obtain financing on specified terms, and contingent on the property appraising at or above the purchase price. Each contract provided for the closing to take place within three weeks from approval for financing. The contract on the 25.1 acres stated that the property was subject to a right of first refusal. It did not state that it was subject to an agricultural easement, even though the seller agreed to provide a warranty deed and marketable title. The buyer had the burden of searching the title and notifying the seller of any objections to marketable title. Mr. Wells already knew about the agricultural easement at the time he made the offer. On November 21, 2002, Thomas Koch signed both purchase and sale agreements on behalf of Laura Banfield pursuant to his power of attorney.

Mr. Wells never requested a separate appraisal for the 25.1 acres. Instead, he requested a single appraisal of the combined parcels.

On or about November 25, 2002, Thomas Koch, Esq., on behalf of Laura Banfield, wrote a letter to Mr. Rappaport stating that Ms. Banfield had entered into a purchase and sale contract subject to Mr. Rappaport's right of first refusal, for the purchase of a 25.1 acre parcel of land. The letter further recited that the agreed purchase price was $150,000.00, subject to a financing contingency of 75% of the purchase price for a term of 30-years with interest not more than 6.25%. No copy of the purchase and sale agreement was included with the notice. It also stated that closing was to be within 3 weeks of the purchaser's receipt of a financing commitment. Mr. Rappaport was asked to respond within 30 days to advise whether he would be exercising his right of first refusal, and he was invited to contact Mr. Koch for additional information.

On December 3, 2002, Mr. Rappaport replied in a faxed letter questioning whether the contingent offer satisfied the requirements of his right of first refusal, and stating that when proper notice was given to him, he would respond. He wrote: "When you have an unconditional offer from a buyer who is ready, willing and able to acquire said property or one that has provided evidence of financing I will expeditiously respond to your communication." He also asked to see a copy of the survey, which he had not yet seen.

In response, on December 5, 2002, Mr. Koch faxed a letter to Mr. Rappaport stating that it was Ms. Banfield's position that the notice was adequate and that a survey would be provided. He also wrote: "You are entitled under the terms of the right of first refusal to purchase the property in question on the same terms agreed to in the offer which Mrs. Banfield accepted." Still, however, Mr. Koch did not provide a copy of the purchase and sale agreement.

On December 6, 2002, Ms. Andrews sent Mr. Rappaport the survey, and he received it on December 7 or 8, 2002. Before he received it, the information he had was that there was a contract for the sale of a 25.1 acre parcel for $150,000. He was not sure what was included, specifically whether or not the house was on the 25.1 acre parcel. He assumed that it must be, because the appraisal he had obtained was for a $300,000 value for the entire Banfield property,

7

which was much larger, and he could not imagine that a buyer in central Vermont would offer $150,000 for a 25.1 acre parcel of land that was subject to a right held by someone else to use it for pasturing cattle and growing crops. When he received the survey, he was still not quite sure, because of the manner in which the survey was drawn. It was unclear to him whether the 25.1 acre parcel being offered to him included all of the land north of Davis Road as shown on the survey.

The marking of the survey is unclear because it shows two small parcels north of Davis Road that have separate boundary lines but may also be within the boundary lines for what is marked as the 25.1 acre parcel. Had that been the case, the house would have been included in that parcel. Although there are labels that say Parcel 3 and Parcel 4 for the 1.0 acre piece next to the house and the 1.8 acre piece on which the house is located, with recording references, they are separated from the 25.1 acre piece only by dotted lines rather than continuous lines. It is difficult to tell from looking at the survey map alone, without additional external information, whether or not Parcels 3 and 4 are preexisting separate parcels from the 25.1 acre piece, or whether they are included within it, and perhaps proposed to be subdivided from it. This court, when first presented with this survey in conjunction with a preliminary motion, was unable to determine whether the house was or was not located on the 25.1 acre parcel. Apparently a professional appraiser interpreting the survey map concluded that the total acreage was 75.5 acres rather than 78.3 acres, assuming that the 1.0 and 1.8 acre parcels were subsumed within the 25.1 acre parcel.

Mr. Rappaport, still not sure exactly what was included but aware that the clock was running on the 30 days Mr. Koch had given him to respond, and knowing that he had a "desperate and significant interest in the land and house," wrote to Mr. Koch on December 18th. At this time, neither Mr. Koch nor Ms. Andrews had provided a copy of the purchase and sale agreement. Mr. Rappaport had requested one from both of them, and had been told by Ms. Andrews that Mr. Koch said no. Nonetheless, Mr. Rappaport stated the following in his letter to Mr. Koch: "Pursuant to your letter of November 25, 2002 and your request therein, this is to inform you that I intend to exercise my right of first refusal. Would you contact me at my Boston office in writing or by phone as to the next steps that need to be taken."

In response to Mr. Rappaport's December 18th letter, Mr. Koch tendered a proposed warranty deed and survey with a letter dated December 27, 2002. The proposed warranty deed stated that it was "in full satisfaction" of the terms of a right of first refusal. At this time, Mr. Rappaport still believed that he held a valid right of first refusal on all of the Banfield property, meaning that his exercise on just a portion would not extinguish the right altogether, so he objected to a deed that stated that by acceptance of it, his right of first refusal was fully satisfied. The proposed warranty deed also made no mention of the easement interest already held by Mr. Rappaport in the parcel of land, nor did it refer to the house. The letter also states: "Please review these documents and advise whether you find them acceptable or feel that any changes are necessary." It also asked whether Mr. Rappaport intended to have Vermont counsel, and offered to close the transaction either at Mr. Rappaport's convenience or through the mail. Mr. Rappaport received this correspondence on January 2, 2003.

Mr. Rappaport then retained Vermont counsel. In a letter dated January 15, 2003, Michael Marks, Mr. Rappaport's attorney, raised an issue concerning the deed description, and asked for a copy of the purchase and sale agreement for the 25.1-acre parcel and the agreements for any related parcels. In the letter he questioned the basis for the sale price of $150,000.00, stating that the price appeared not to take into account the agricultural easement that encumbered the property. In response, on January 17, 2003, Mr. Koch for the first time provided a copy of the purchase and sale agreement for the 25.1-acre parcel, but declined to provide copies of any other purchase and sale agreements entered by Laura Banfield to sell the balance of her contiguous property in East Montpelier on the grounds that Mr. Rappaport did not have any legitimate interest in them. Mr. Koch also wrote that the attorney for Mr. Wells believed that "if Mr. Rappaport does not close within a reasonable time after his notice of exercise of the right of first refusal, his right will expire, and Mr. Wells will once again be entitled to consummate the purchase. I don't want to express a view on that, except to say that I, too, would like to resolve this quickly and satisfactorily."

On January 28, 2003, counsel for Mr. Rappaport again wrote Mr. Koch requesting the second contract and questioning the allocation.

On February 5, 2003, Matthew Colburn, attorney for Mr. Wells, provided written notice to both Mr. Koch and Mr. Rappaport's lawyer Michael Marks that Mr. Wells had obtained a written commitment for financing and that a closing needed to be scheduled in three weeks. Thus, the time for closing under the Wells contract was approximately February 26th.

As of February 6th, Mr. Rappaport still incorrectly believed that he held a right of first refusal on the entire Banfield property; he only held a deeded right of first refusal on the 25.1 acre parcel. By this time he knew that the house was not on the 25.1 acre piece, and that he was being asked to match an offer for $150,000 on a parcel of land burdened by his agricultural easement. He was also being denied information about a contract for the remainder of the Banfield land. He knew that the entire Banfield property had appraised at $300,000 as a single unit, which was the way it was being offered for sale. He reasonably believed that there was a second contract for the remainder of the Banfield property, and that there may have been a disproportionate allocation of value to the 25.1 acre parcel to inflate its price in order to deter him from exercising the right of first refusal.

On February 7, 2003, Mr. Rappaport filed this suit, and sought a preliminary injunction of the sale of all the Banfield land until the case could be adjudicated. He obtained an appraisal from James Thetford on the 25.1 acres as a separate parcel. James Thetford did an updated appraisal of the market value of the 25.1 acres as a separate parcel, sold alone, subject to the agricultural easement. Mr. Thetford's opinion is that its fair market value as of March 20, 2003 as a freestanding parcel subject to the agricultural easement is $58,000. He also opines that factors that are personal to a particular buyer can induce a buyer to pay more for a particular parcel than its fair market value as a separate parcel. His opinion of $58,000 assumes that the property would be subject to an agricultural encumbrance which severely restricted the use that a

potential buyer (other than Mr. Rappaport) would be able to make of the property.   Having an interest in adjacent property, and having a personal connection with a particular property, constitute factors that can increase the amount an individual is willing to pay for a particular parcel above its fair market value, and are not considered components of fair market value since they cannot be translated into what a willing buyer and willing seller, without additional factors, would pay for a particular parcel.  His opinion did not include consideration of the enhanced value that an abutter who wants to protect his own property would pay, nor the amount that might be offered by a person with an emotional attachment to the particular property.  He acknowledged that a right of first refusal can result in an increased sales price if there is a "bidding thing" going on between potential buyers who both have special reasons for wanting the property.  He also acknowledged that an owner of the Banfield house and 53.2 acres would probably pay a premium for the 25.1 acre parcel, above its market value, and in that case he would not consider such a premium a component of value in doing a fair market value appraisal.  Mr. Rappaport's right of first refusal does not give him a right to buy at fair market value, but rather "at the highest price offered" to Laura Banfield.

At no time did Mr. Koch notify Mr. Rappaport that his right of first refusal would expire by a specific date unless Mr. Rappaport accepted the warranty deed that Mr. Koch had tendered.  At no time prior to filing suit was Mr. Rappaport given a copy of the second Wells contract.

The damage that would be suffered by Mr. Wells if a preliminary injunction is granted, and then dissolved after a final hearing on the merits, is a possible increase in interest rates associated with a loan to finance his acquisition.  He has submitted figures showing possible losses depending on various interest rates, but no information from which the court can reach an informed decision about future changes in interest rates.

Mr. Rappaport's position is that the price assigned to the 25.1 acre parcel under Laura Banfield's contract with Mr. Wells is disproportionately high, and he requests the court to determine a reasonable price for the 25.1 acre parcel, and permit him an opportunity to choose whether to exercise his right of first refusal at that price.  His position is that because the contract with Mr. Wells did not state that the property was subject to the agricultural easement, including a restriction that only one structure could be built on it, he had no way of knowing whether the price offered by Mr. Wells took those restrictions into account.  Similarly, he had no means of investigating his suspicion that the situation was set up so that Mr. Rappaport would fail to exercise his right because the price was so high, and then the contract would be terminated by Mr. Wells because the seller could not deliver marketable title, resulting in Mr. Rappaport's right of first refusal having been extinguished and leaving Mr. Wells or someone else free to negotiate for a lower price free from the pressure of the right of first refusal.

Mr. Wells's position is that Mr. Rappaport had an opportunity to exercise his right of first refusal, and that when he filed suit on February 7, 2003, he repudiated his right to exercise the right of first refusal, and he therefore no longer has the legal ability to exercise his right of first refusal.  His alternative position is that Mr. Rappaport did not perform within a reasonable time,

10

and his right to perform has expired. Ms. Banfield's position is that Mr. Rappaport has not shown that he made an unconditional acceptance of the right to purchase within the 25.1 acres within the required thirty days.

Conclusions

Mr. Rappaport held a right of first refusal on 25.1 acres, which was already subject to his agricultural easement. Mr. Rappaport had the right to match the highest offer made for the purchase of that parcel. Ms. Banfield, when she chose to sell the parcel, had the responsibility to offer it in a manner that would not impair Mr. Rappaport's right of first refusal.

It is true that in preparing to market the property, Laura Banfield, and Ms. Andrews as her agent, did nothing to structure offers on the various parcels in a manner that would honor Mr. Rappaport's right of first refusal. That does not, however, mean that they attempted to impair or defeat it, or that Laura Banfield could not offer her entire holdings for sale just because only one of four parcels was subject to a right of first refusal. She or Ms. Andrews may not have fully appreciated the need to structure offers and contracts in a manner to accommodate Mr. Rappaport's right to match a market offer. Inattention or lack of understanding, if present, were immaterial because Mr. Wells understood the necessity of making two independent market offers to properly honor the right of first refusal, and he did so in a manner fully consistent with fair dealing as to that right. As a consequence of his two independent offers, there was never any single contract in which Parcel 2 was bundled together with the other parcels for a single unallocated price, nor was there an artificial price allocation made without reference to market factors and designed only to defeat the exercise of the right of first refusal.

The price for the 25.1-acre parcel is justified by the factors about which Mr. Wells testified, which are logical and consistent. Mr. Wells was committing himself to purchase the house and 53.2 acres in any event, with or without the additional 25.1 acres. His offer to purchase the house and 53.2 remaining acres was not contingent on obtaining the right to purchase the 25.1 acre piece. Given that his contract to buy the house, if accepted, would give him an equitable interest in the house property, he had valid reasons for bidding high on the 25.1 acres to prevent Mr. Rappaport from acquiring the fee to the 25.1 acres. Part of this was to obtain a guaranty that the 25.1 acres would remain open and undeveloped to retain the spectacular views from the house parcel. The views constitute a prominent and valuable feature of the house, without which its use would occur differently and its value would be impaired. Part was to keep the property intact, as it had been during the Banfields' ownership, when Mr. Wells developed personal and emotional ties to the property, increasing his childhood attachment to it. Part was to acquire the land itself, so as to control it. While the existence of the agricultural easement might diminish the market value of the 25.1 acres as a freestanding parcel, since it would limit the use of the land, it had no such impact for Mr. Wells. On the contrary, he saw ownership of the agricultural easement by the same owner who held the right of first refusal as a danger, since it represented more, not less, potential development on that land. Since he planned to invest an additional

11

$200,000 in value in the house, it was worth a lot of money to him to prevent the merger of the agricultural easement and the purchase of the fee, and $150,000 was a reasonable price in order to protect the significant investment he was planning to make in the house.

Mr. Wells structured his offer to purchase the Banfield property as two independent offers, neither of which was conditioned upon his ability to acquire the other piece. He took into account in a rational way the factors that affect the value of each as a separate parcel. His explanation of why he offered $275,000 for the house and 53.2 acres is sound: although that price may appear low as a proportion of the total of $425,000, the property would be worth only $275,000 as long as it carried the risk that the views would be destroyed, or if they were destroyed. Furthermore, the house needs $200,000 worth of work to be renovated in a manner consistent with its character and current standards. Since the appraisal showed an overall value of $300,000, attribution of $275,000 to the house and that portion of the acreage that does not provide the pond or views is not unreasonably low.

Similarly, his explanation of why he offered $150,000 for the 25.1 acres is sound: it would be worth that much to guaranty the spectacular views on a residential property in which he would have a $475,000 investment (after improvements), even though a normal buyer would not pay that much for that particular parcel as a freestanding lot subject to an agricultural easement. Mr. Rappaport's argument of lopsided allocation might be a valid one if the allocation were further in the extreme, such as $75,000 for the house and 53.2 acres, and $350,000 for the 25.1 acres. The facts as developed at trial, however, are consistent with Mr. Wells' own testimony: that the minimum that could in good faith be attributed to the house, based on market value information, was $275,000. He knew that Laura Banfield would accept an aggregate offer of $425,000, and she apparently had no reasons of her own to negotiate the allocation. It was worth it to him to pay $150,000 for the 25.1 acres to protect the house.

These considerations reflect market forces and an honest "bidding thing" between two eager buyers, rather than an attempt to subvert Mr. Rappaport's right of first refusal with artificial price manipulation. The reasonableness of this position is demonstrated by the example that if a buyer purchased only the house and 53.2 acres because Laura Banfield would sell no more, and then had the chance to buy the 25.1 acres one year later, and by doing so could prevent Mr. Rappaport from acquiring the fee and merging it with his agricultural easement to make the land eligible for development as three acre lots, it would not be an unreasonable investment to pay $150,000 under such circumstances, even though a nonabutter, or total stranger, is not likely to make such an offer.

Therefore, the evidence does not support a factual finding that the price allocation was padded, manipulated, or unreasonably inflated, as in the cases Plaintiff relies on. The court in Gleason v. NorWest Mortgage, Inc., 243 F. 3d 130 (3rd Cir. 2001), remanded to the trial court for a determination of whether the price at which property was offered to the holder of the right of first refusal was padded, but this court has already heard the evidence and made the factual finding that it was not. The court in Pantry Pride Enterprises, Inc. v. Stop & Shop Companies,

12

806 F. 2d 1227 (4th Cir. 1986) remanded to the trial court because the allocation was artificial and would result in a windfall unless the court did the apportionment based on market factors, but in this case there is no circumstance of windfall and the court has found as fact that market factors support the prices of both the contracts. In Gyurkey v. Babler, 103 Idaho 663 (1982), the allocation of $50,000 for the parcel at issue, Lot 13 (one of several lots in a package deal), when the lot was offered to the holder of right of first refusal was determined to be artificial. The lot was originally priced, and later transferred to the buyer, at a value of $30,000. The court concluded that the holder had been denied the right to purchase on the same terms as the actual ones at which the property was made available to the buyer, and for a remedy enjoined the sale of Lot 13 to give the holder the opportunity to match a bona fide market offer for it.

There is no evidence of any attempt to use a manipulated price when Mr. Rappaport was given the opportunity to purchase under his right of first refusal, or any attempt to avoid selling the 25.1 acres to Mr. Rappaport. Mr. Koch acted to facilitate such a sale. The facts in the cases Plaintiff cites are unlike those here. In this case, there was never any contract to sell the 25.1 acre parcel bundled together with other property for a single unallocated price. Furthermore, the Plaintiff has not proved that the price of $150,000 was artificial or is unsupported by market factors, or that the price of $275,000 for the house and 52.3 acres is inconsistent with market-based information. Thus, Plaintiff has not proved facts showing that he is likely to prevail on the merits of his claim that the Defendants were seeking to force him to forego his preemptive right through the device of selling the 25.1 acres bundled with other parcels and subject to an artificial and unsupportable allocation.

Mr. Rappaport argues that the Wells purchase and sale agreement also required that the sale was contingent upon the 25.1 acres appraising at or above the purchase price of $150,000, and that this contingency was not satisfied because Mr. Wells never obtained an appraisal on this portion of the property. While that is true, the contract provision made *Mr. Wells'* obligation to perform contingent on satisfaction of that condition, but did not make it a condition precedent to the contract as a whole. Mr. Wells could waive that contingency if he so chose, just as he could waive the financing contingency, as could Mr. Rappaport. It is also true that the benefit of this contract term was never offered to Mr. Rappaport. However, that seems a moot point, since the court has concluded that there is nothing improperly disproportionate about the allocation of overall price between the two contracts entered into between Laura Banfield and Mr. Wells, and therefore nothing improper about the $150,000 price under the contract for the 25.1 acres. Mr. Rappaport could decline to purchase the 25.1 acres based on an insufficient appraised value if he wished, but if he did so, he would lose the property he wishes to buy to Mr. Wells, who stands ready to buy without invoking the right to back out of the contract on that ground. The existence of that protection for the buyer does not invalidate the contract. The contract remains valid, and thus Mr. Rappaport must either exercise or not exercise his right to match its terms.

Defendant Wells contends that injunction is not an appropriate remedy, because Mr. Rappaport could have purchased the property and then sued for damages. Under Vermont law, injunctive relief is available to protect interests in real property where such relief is necessary to

avoid irreparable harm. If Mr. Rappaport is wrongfully prevented from exercising a valid right to purchase a particular parcel, the harm will be irreparable because of the uniqueness of the characteristics of the parcel. The question, therefore, is whether Mr. Rappaport, having failed to prove a likelihood of prevailing on the merits of his claim for disproportionate pricing sufficient to enjoin the sales to Mr. Wells under both contracts, is entitled to enjoin the conveyance of the 25.1 acre parcel to Mr. Wells in order to give himself time to complete his exercise of his right of first refusal as to the 25.1 acres.

Defendant Wells contends that an injunction should be denied because Mr. Rappaport agreed to the terms offered by Mr. Wells for the purchase of the 25.1 acres, and then repudiated that right by filing suit on February 6th. The facts do not support this conclusion. The facts show that Mr. Rappaport consistently acted with every intention of exercising his right of first refusal. There is no factual basis for concluding that prior to February 6th, he had repudiated the contract. The question, then, is whether he did so by filing suit. The facts show that his purpose in filing suit was not to repudiate his right, but to enforce it. He was not tardy on closing, as there were more than two weeks remaining during which he could close, as measured by Mr. Wells' receipt of a financing commitment.

Although Mr. Koch encouraged him on January 17, 2003 to proceed to close within a reasonable time, Mr. Koch never took a position that his time for performance had expired or would expire by a specified date. Moreover, the facts demonstrate that as of February 6th, Mr. Rappaport reasonably saw before him a valid prime facie case of price manipulation: the Banfield property had been offered as a single unit, yet he was not permitted to see the contract on the balance even though he had asked for it several times. He had not even been permitted to see the written contract on the 25.1 acres until his Vermont counsel requested it, even though it constituted the complete terms of Laura Banfield's irrevocable offer to sell that he had the right to accept. Cameron v. Double A. Services, Inc., 156 Vt. 577 (1991). He was not provided with the survey until he requested it, although it was provided to Mr. Wells earlier. The terms of the contract on the remaining property were being concealed from him, the contract price for the 25.1 acre piece was at least $50,000-100,000 higher than fair market value as determined by a recent appraisal, and the agricultural easement was not mentioned as an exception in the Wells contract, indicating that it may not have been taken into consideration when the price was set.

These facts were sufficient to lead a reasonable person to conclude that a buyer had offered to buy the whole Banfield property for a single price, and had artificially shifted value to the 25.1 acre contract in order to subvert the exercise of Mr. Rappaport's right of first refusal. Under those circumstances, in order to assure that he was not being wrongfully induced to exercise his right at an improper price, or wrongfully induced to extinguish a valid legal interest which he wished to exercise, he had no choice but to seek redress by appropriate legal means, including filing suit. This did not amount to repudiation as a matter of fact or law, but an attempt to exercise the right on a valid lawful basis. Thus, the court concludes that Mr. Rappaport has not repudiated his right to exercise the right of first refusal; on the contrary, he has acted consistently with his stated intent to exercise it. Although discovery and a court hearing have subsequently

14

revealed that Plaintiff has not shown a likelihood of success on his claim that Laura Banfield and Mr. Wells acted wrongfully with respect to his right or that the price allocation was manipulated artificially, this could not have become known to Mr. Rappaport without invoking legal process. Therefore, he remains entitled to complete the exercise of his right as to the 25.1 acres.

The time for closing under the contract was defined as three weeks from the receipt of the buyer's financing commitment. In exercising his right of first refusal, Mr. Rappaport is bound by this term. The purpose of such a provision is to provide a three week period from the date upon which contingencies are satisfied or waived to complete preclosing tasks. This gives time for searching the title, responding to proposed conveyancing documents, and other preparations for closing. It is reasonable for Mr. Rappaport to have this amount of time to close on the 25.1 acres, prior to it becoming available for conveyance to Mr. Wells under his contract. The evidence is clear that unless the court enjoins a sale to Mr. Wells for a three week period, there is a likelihood that the Defendants will take the position that Mr. Rappaport's time for exercise of the right has expired due to the passage of time, since they have declared in this proceeding that this is their position.

For the foregoing reasons, the Plaintiff has shown a valid basis for a preliminary injunction, in that he has shown that he is entitled to three weeks to close on the purchase of the 25.1 acres, and that without an injunction he will be irreparably harmed in that there is a reasonable likelihood that the property would be conveyed by Defendant Banfield to Defendant Wells. A preliminary injunction will be issued enjoining the sale of the 25.1 acres for three weeks from the date of this order.

V.R.C.P. 65 (c) grants the court the discretion to establish security in an amount to secure the costs and damages incurred if the injunction is found to be wrongful. The evidence introduced by Defendant Wells concerning the possibility of damages in the form of increased interest rates is not sufficiently reliable for the court to conclude that security is needed, particularly for a period only three weeks long. Therefore, the court declines to require security.

**ORDER**

For the reasons set forth above,

Plaintiff's motion for preliminary injunction is *granted* as to the 25.1 acres for a period of three weeks, and

Defendants' request for security is *denied*.

Dated at Montpelier, Vermont, this \_\_\_\_\_ day of April, 2003.

_____

Mary Miles Teachout

Superior Judge

STATE OF VERMONT
WASHINGTON COUNTY, SS.


JEROME RAPPAPORT          )
                           )
      VS.                )             Washington Superior Court
                           )             Docket No. 80-2-03 Wncv
LAURA BANFIELD AND    )
DUANE WELLS           )


### **Preliminary Injunction**


       Defendant Laura Banfield is hereby enjoined from conveying to defendant Duane Wells her interest in the lands and premises in East Montpelier, Vermont shown as Parcel 2 on the survey dated December 13, 2002, consisting of 25.1 acres, and conveyed at Book 20, Page 499 of the East Montpelier Land Records.  This preliminary injunction shall be in effect for a period of three weeks from the date it is entered, at which time it shall expire.  This preliminary injunction shall be binding upon the defendants, their agents, servants, employees and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.


       Dated at Montpelier, Vermont, this _____ day of April, 2003.


                                         _____
                                         Mary Miles Teachout
                                         Superior Judge